BROWN v. COLE.

(Supreme Court, Special Term, Fulton County.   April, 1907.)

1. ACTION—ENFORCEMENT OF POLITICAL RIGHTS.
There no longer remains any distinction, so far as enforcement is concerned, between civil and political rights of citizens; but it will be presumed that every right recognized or conferred by statute may be enforced by a proper legal method, and that every wrong, whether civil or political, has its remedy.

2. ELECTIONS—POLITICAL COMMITTEES—LIABILITY TO BE SUED—STATUTES.
The county committee of a political party, regardless of the form of its membership, constitution, by-laws, or rules, or of the purpose for which it exists, and though unincorporated, may be sued 'as a voluntary association under Code Civ. Proc. § 1919, authorizing suits by or against unincorporated associations consisting of seven or more persons.

3. SAME—PARTIES.
An action against such association was properly brought against its chairman, as provided by such section, instead of against the association itself.

4. SAME—RIGHT TO SUE.
A member of a political party has capacity to sue the county committee of such party to restrain them from putting into force an illegal enrollment scheme, the effect of which will prevent legal voters from voting, and will permit illegal voting, though complainant is not a member of such county committee.

5. SAME—PLEADING.
A complaint alleged that defendant Republican committee of F. county without authority had proceeded to establish rules prescribing the qualifications of voters at primaries, and in carrying out such regulations had appointed enrolling boards in the respective districts and wards of the county, and had conferred on such boards discretionary power to place on or strike from the roll the names of voters and to limit the voters at the party primaries to those appearing on such roll, and that it was the intention of the committee by means of such enrollment to prevent many Republican voters, having a legal right to vote, from voting at the primaries, etc.   Held, that the complaint stated a cause of action for equitable relief.

6. SAME—ENROLLING BOARDS—COUNTY COMMITTEE—POWERS.
The county committee of a political party cannot confer power on an enrolling board to make rules governing the qualifications of voters at primaries.

7. SAME—ENROLLMENT.
The county committee of a political party had no power to formulate a system of enrollment of voters for primary elections which would prescribe other and different qualifications than those provided by Election Law, Laws 1896, p. 922, c. 909, § 53.

8. SAME—INJUNCTION.
Where the carrying out of a proposed illegal enrollment scheme would result in confusion, and the probable refusal to permit the candidates elected at such primaries to have their names placed on the official ballots, an injunction was allowable to restrain the carrying of such scheme into effect.

9. DISMISSAL—NOTICE OF INTEREST.
In a suit to restrain the county committee of a political party from enforcing a proposed illegal enrollment scheme, a notice to the court that plaintiff had lost personal interest in the controversy, intended simply to relieve plaintiff from costs, did not confer authority on the court to vacate the injunction or discontinue the action.

Suit by Asa J. Brown against John A. Cole, as president and chairman of the Republican county committee of Fulton county. On return of an order to show cause why an injunction restraining the enforcement of a proposed enrollment plan for the voters of the county should not be continued pendente lite. Injunction continued.

Dewitt C. Moore, for plaintiff.
Andrew J. Nellis, for defendant.

SPENCER, J. This action is brought by the plaintiff, as a Republican elector of Fulton county, in behalf of himself and all other Republican electors in the county, to obtain the judgment or order of this court restraining the defendant, as chairman of the Republican county committee, and said committee, its agents, servants, and appointees, from carrying into execution a system of enrollment, formulated by said committee, by which all persons are to be excluded from participation in Republican primaries in the county except those whose names appear upon said enrollment. An injunction was issued, and thereafter modified ex parte, and this is the return of an order to show cause why it should not be made permanent as so modified. The questions involved in this motion are of great public importance. In order to correctly decide them, it will be necessary to take a brief view of the history of our statutory laws concerning the political rights of citizens and the jurisdiction of the courts to adjudicate thereon.

1. The plaintiff in the case at bar sought the injunction, and it was granted by the court, for the sole purpose of preventing alleged illegal action in the affairs of a political party and the protection of the plaintiff's political rights therein. Interference by injunction is among the highest prerogatives of a court of justice. Its exercise lies in the discretion of the court, and is only employed in the preventive form in order to stay a threatened or nonexistent injury. The status quo is thereby maintained until a final hearing and decision may be had. Hitherto the exercise of this power has been confined to the protection of civil rights, as distinguished from those which are political. 22 Cyc. 740, 757. It must be conceded that there are many decisions to the effect that the powers of the court may not be invoked to protect the political rights of a citizen, or to restrain, direct or control the methods of a political party, and therefore the injunction so granted must be vacated unless justification therefor may be found in recent enactments of the Legislature.

In the common law no place was found for the political rights of citizens. The nearest approach thereto was the ancient writ of quo warranto, which was employed on occasion to adjudicate between adverse claimants to public office. But the writ did not move in the interest of either claimant, but only on behalf of the king to prevent the unlawful usurpation of a public franchise. The same was true of political parties and the conduct of elections. They were only regarded as matters of concern between the citizen and the king, and, the king being supreme and the courts his creatures, their doors were not open for such adjudications. These views of the political rights of citizens became a part of the common law in this country. In

like manner other systems and institutions, which had grown up under monarchical forms of government, found a place in our system of jurisprudence, and some still remain in whole or in part to incumber our courts and hamper the administration of justice. Among these may be mentioned the grand jury system, which still survives, although in a modified form, and the common-law doctrine of the property rights of married women, which, after a prolonged struggle between courts and Legislatures, has been practically abolished.

The necessity for a different rule regarding the nonrecognition of the political rights of citizens did not become apparent for many years after the formation of our government, and the ancient doctrine found expression in numerous decisions of our courts. The reasons therefor were not those which originated the doctrine, but were found in the fact that such rights were regarded as belonging to matters which did not concern the public at large, and from their very nature beyond the pale of the law. Political parties differ from individuals, corporations, and chartered organizations, in that they are not liable to amercement, incarceration, or dissolution and therefore not subject to the familiar methods of governmental restraint. For many years statecraft was at a loss to discover any method by which they might be brought under effectual control. Without liability or responsibility, and suffered to act without restraint, it is no wonder that in their efforts to control elections they often resorted to fraud, force, chicanery, and bribery. It is needless to refer to the mournful history of politics to demonstrate the importance of some method by which they should be restrained and their use of improper influences prevented. The struggle to accomplish this result has left its marks upon the statute books of this state for the last 50 years, where the history of its progress may be read by any one desiring enlightenment upon the subject. A hasty review is all that is necessary for our present purpose.

What may be regarded as the first serious effort was the passage of the law of 1859, requiring the registration of voters at public elections. Chapter 380, p. 895, Laws of 1859. This statute was aimed at a flagrant political evil known as "repeating and colonization," but did not accomplish its full purpose until 1882, when by an amendment to the Penal Code illegal voting at party primaries was made a crime. Chapter 154, p. 188, Laws of 1882. This was, I believe, the first recognition by law in this state of the existence of political parties, and that crime might be committed in relation to their affairs. But frauds in elections in various forms still continued, and the necessity for a secret ballot, in order to discourage, and if possible prevent, the use of money in the corruption of voters, led to the enactment of the law of 1890, which required the use of official ballots, furnished by public officials at public expense, and requiring their exclusive use at elections. Chapter 262, p. 482, Laws of 1890. The results of this enactment were manifold, but its most important element lay in the fact that it necessitated the regulation of the internal affairs of political parties in order to secure legal certificates of nominations of candidates for office. It may well be regarded as the most important and valuable of all our legislation upon this subject. Its indirect results have,

however, been of more consequence than those which it was intended to accomplish.

Among the most important of these statutory provisions is the one which relates to the qualification of voters at party primaries. Election Law, Laws 1896, p. 922, c. 909, § 53. The statute provides that no person shall be entitled to vote at any primary, unless he be qualified to vote for the officers to be nominated thereat on the day of election and shall possess such qualifications as shall be authorized by the regulations and usages of the political party or independent body holding the same. The statute also prescribes the duties of the respective officers of the primaries and regulates the method of procedure and the manner of voting. The objects of these provisions are manifest, and it is not to be presumed that the Legislature would so attempt to regulate and prescribe, in respect to the holding of primaries and the qualifications of voters thereat, without intending to enable one having an interest in such primaries to protect and defend his rights and enforce compliance with the law. Otherwise the statute would be inane and an elector powerless. In addition to the foregoing, the Legislature has, in respect to cities of the first and second classes, imposed upon political parties therein a system of enrollment of the members of each party and limited the voters at primaries to the persons whose names appear so enrolled. The Legislature has also provided that this system of enrollment may be used in cities of the third class and villages upon the concurrent vote of the general committees of the respective parties therein. Reference is here made to the enrollment laws for the purpose of indicating the completeness of the legislation of recent years touching the rights of electors, the regulation of political parties, and the duty and jurisdiction of courts to take cognizance thereof. From this review of such legislation, I conclude that the old doctrine that political rights were beyond the domain of judicial investigation and determination has been swept away, that there no longer remains any distinction between the civil and political rights of citizens, and that the courts may not shut their doors against the enforcement of any such rights. It will be presumed that every right, recognized or conferred by statute, may be protected, defended, and enforced by an appropriate legal method and that every wrong has its remedy.

2. The statute law, having thus in great measure recognized and prescribed the political rights of citizens, it was not necessary to confer jurisdiction by special enactments upon the courts to administer justice in respect thereto. It is true special provisions have been made in relation to special and particular matters, but the general jurisdiction of the Supreme Court to take cognizance of all the legal rights of persons cannot be doubted. As early as 1849 the Legislature provided for the bringing of suits by and against unincorporated associations (chapter 258, p. 389, Laws 1849; chapter 455, p. 838, Laws 1851), and these statutes were subsequently amended and extended and are now found in the Code of Civil Procedure. Section 1919, Code Civ. Proc. It has never been doubted that all political parties and their respective conventions and committees were included within the terms of this statute. Ebbinghousen v. Worth Club, 4 Abb. N. C. 300; People

ex rel. Coffey v. Dem. Gen. Com., 52 App. Div. 170, 65 N. Y. Supp. 57; 164 N. Y. 335, 58 N. E. 124, 51 L. R. A. 674. Since these decisions the Legislature has been making rapid strides in the passage of laws regulating political parties. Chapter 195, p. 488, Laws of 1902, amended by chapter 498, p. 1378, Laws of 1906; also chapter 502, p. 1385, Laws of 1906. It has proceeded upon the assumption of the existence of political committees and recognized them as existing entities. To deny their existence is to deny the sun at midday. It is said by Presiding Justice Goodrich, in People ex rel. Coffey v. Democratic General Committee, supra:

"It is a matter of common knowledge that for many years the machinery of both the great political parties has embraced national, state, county, and ward committees, each in the order of its rank directing the holding of conventions for the nomination of candidates for office and the holding of primaries for the election of delegates to itself and to conventions."

Speaking of the primary election law, the learned justice continues:

"These acts entirely altered the character of the primary election and dignified it as a public function. They changed the character of the general committee from that of a voluntary association to that of a public and statutory body and recognized the equal importance of primary and general elections."

The section of the Code (1919) is broad and includes every form of unincorporated association. It is impossible to imagine a combination of seven or more members not within its provisions. It matters not what its form may be, how its membership shall be constituted, whether it has or has not a constitution, by-laws, or rules, nor the purpose for which it exists, if not incorporated, it is an unincorporated association. I think it is, therefore, clear that the defendant committee may be sued as such.

Criticism is made as to the form of the action, as being against the chairman, and not against the association itself. But this method of bringing unincorporated associations into court is authorized by express provisions (Code Civ. Proc. § 1919), and by precedents in numerous actions so brought (Hatheway v. Amer. Mining Stock Ex., 31 Hun, 575).

3. It may be said that, inasmuch as the plaintiff is not a member of the county committee, he may not maintain a suit to restrain the committee from carrying out the enrollment system promulgated by it. Such a view fails to take cognizance of the dual character of political organizations which is a matter of common knowledge. The organization of political parties, their membership, their primaries, conventions, and committees, and the manner in which they are related and connected, is as familiar to every one as are the salient features of our form of civil government. The defendant committee is dependent upon the Republican party of the county for its existence. It is its agent and servant in the administration of its affairs, and is subject to its control. The plaintiff, as a member, has the right to vote at its primaries and the right to prevent those from voting who have no right so to do. He has also the right to prevent any committee or agent of the party from taking any illegal action that shall prevent a legal voter from voting or from permitting illegal voting. These

are among the necessary and essential rights of every member of the party. The instance of a taxpayer's right to sue a public official is not parallel. An instance more nearly in line is that of a stockholder in a joint-stock association (Ostrom v. Greene, 161 N. Y. 353, 55 N. E. 919), who may restrain illegal action on the part of its board of directors. See, also, Boston B. B. Ass'n v. Brooklyn B. B. Club, 37 Misc. Rep. 522, 75 N. Y. Supp. 1076, and Buker v. Leighton, 63 App. Div. 507, 71 N. Y. Supp. 610.

4. But it is claimed that the facts alleged in the complaint do not constitute a cause of action. I think otherwise. The complaint sets forth that the plaintiff is a member of the Republican party, that the defendant committee is the general committee for the party in Fulton county, that the statutes of the state prescribe the qualifications of voters at the party primaries, and that the defendant committee, without any authority so to do, have relegated to themselves the right to establish rules and regulations prescribing the qualifications of voters at such primaries in violation of the statute; that in carrying out these regulations, the defendant committee has appointed enrolling boards in the respective districts and wards of the county, and conferred upon such boards discretionary power to place upon or strike from the roll the names of voters, and to limit the voters at the party primaries to the voters whose names appear upon such rolls; that it is the intention of the defendant committee, by means of such enrollment, to prevent many Republican voters having a legal right to vote from voting at the primaries of the party. The matters thus alleged are matters of the gravest importance to all members of the Republican party, and if, as we have decided, they have the legal capacity to protect their rights against such illegal action of a county committee, then I think there can be no question but that the facts alleged constitute a cause of action in their behalf.

5. This brings us to the question whether the alleged acts of the defendant committee are illegal and without authority. An intelligent answer to this question necessitates consideration of certain matters that are common to all political parties and within the common knowledge of all the people, so much so that the court must take judicial cognizance thereof. It is well known that the great body of citizens is divided into political parties and that the machinery of these parties is substantially alike. The source of all authority is the will of the individual members, which first finds expression at the district or ward primaries. These have been carefully regulated by law, and it is here that delegates are elected to county conventions. At county conventions, rules and regulations are adopted for the government of the party, delegates are selected to state conventions (Election Law, Laws 1896, p. 920, c. 909, § 50), candidates for public office in the county nominated, and a county committee appointed to take charge of the affairs of the party. At state conventions, similar functions are performed for the state. It is well known that an important function of all conventions is to legislate for the party, and that the committees, appointed for county and state, simply have administrative and executive powers. Historically this system of political organizations and government is as well known and understood as is the division

of the government into executive and legislative branches, and conflicts in respect thereto are as rarely known.

It is an undoubted fact that the Legislature may impose upon the several political parties a system for the enrollment of its members and limit the voters at primary elections to the persons so enrolled. It has done this in respect to parties in cities of the first and second classes, and it seems beyond debate that candidates, nominated for office in violation of such enrollment system, must be denied place on official ballots. Any other conclusion would render the laws regulating primaries, nominations, and official ballots absolutely nugatory, to be obeyed or not at the will of any political party. This system of enrollment has not, it is true, been imposed upon cities of the third class and villages; but its use there is made dependent upon the concurrent assent of each political party in such a city or village. It will not be necessary or wise to discuss or consider whether a political party in a city of the third class or a village may of its own motion promulgate and adopt a system of enrollment of its own other and different from the one so held out for acceptance by the Legislature. Much may, no doubt, be said pro and con on that subject. All that is proper to decide on this motion is whether a county committee may, without authority from the party convention, promulgate, adopt, and put in force any enrollment system whatever. This, I believe, the committee has no right to do. But it is not necessary to go even so far as that. All that we need determine is whether such committee may adopt and enforce an enrollment which does violence to the provisions of the statute.

I think no one will seriously contend that the exercise of such powers is within the duties of the committee. It has been the diligent purpose of the Legislature to protect and safeguard the party primaries, so that they shall express the will of the members of the party, and that such will shall find free and correct expression in the results. To this end the statute prescribes what the qualifications of voters at primaries shall be. Election Law, § 53. The party, neither at its conventions nor by any of its committees, may directly or indirectly make null the statute by prescribing qualifications in conflict therewith. Some of these qualifications may be prescribed by the regulations and usages of the political party; but a committee with administrative and executive duties only may not by resolution prescribe what such regulations and usages are. It is the party, and not the committee, that may do this. Under the statute it is at the primaries where in the first instance the regulations and usages of the party are determined upon the challenging of an intending voter. The county committee may not give power to an enrolling board to make rules governing such matters.

But it may be urged that the Legislature has by implication conferred authority on county committees to establish a system of enrollment of the persons who are entitled to vote at its primaries. Not so. It has, it is true, provided a system and imposed it upon cities of the first and second classes, but left it optional with cities of the third class and villages. No authority to establish another or different system may be inferred from such legislation. The only inference, if any,

which may be drawn from such legislation, is that the county committee shall not adopt any system except the one prescribed and in the way and manner there pointed out. I am therefore led to the conclusion that the defendant committee had no authority to formulate the system of enrollment set forth in the complaint and enforce it upon the party primaries, and that such threatened action is illegal and should be prevented.

6. The objection that a temporary injunction should not issue needs but a passing notice. That an injury will be done to the rights of the plaintiff and all other Republican voters by putting into operation an illegal system of enrollment must be apparent. Should the defendant committee proceed with its enrollment programme, and the same be enforced at the primaries and be illegal, the injury would be beyond remedy. It is impossible to foretell the confusion which might result. It is highly probable that any candidate, nominated by a party as the result of primaries at which the voters are limited to those whose names are upon an illegal enrollment, would be denied place upon the official ballots. It is here where the discipline of political parties finds application. If its illegally nominated candidates have the same right to a place on the ballot as those legally nominated, the entire system of laws regulating parties and their internal affairs falls to the ground. Should·it be finally held that the injunction is improper, no serious injury can result to the defendant committee or to any one else, as it does not appear that the adoption and use of an enrollment is called for by any pressing necessity.

The notice handed up by the plaintiff upon the argument is nugatory. Any order of the court may not be so countermanded and rendered ineffectual. This is especially so when it relates to an injunction, which continues until set aside by the court. The notice in question is simply to the effect that the plaintiff has lost personal interest in the controversy. He gives no authority to the court to vacate the injunction or to discontinue the action. It was conceded by counsel to be simply intended to relieve the plaintiff from costs. The plaintiff may discontinue his action and have his injunction vacated by consenting thereto or by formal stipulation, but he has done neither.

The injunction, as modified, is therefore continued pending the action. Ordered accordingly.