George C. Mantjzoros, J.
This is an action in equity by plaintiff, a not-for-profit organization, formed by B’nai B’rith in 1913, to enjoin the appropriation, imitation and use of “ anti-defamation league ” and the symbol “ADL” by defendant league, a voluntary association, formed January 1,1972. Plaintiff alleges that the phrase and symbol in issue have acquired a secondary meaning and that protection by injunction is required to prevent [1] ‘ resultant confusion and deception to the public, in respect of fund raising and otherwise, and * * * confusion as to plaintiff’s policies ivith resultant, irreparable and incalculable loss and damage to plaintiff.” Moreover, plaintiff alleges that it has “ consistently refused to sanction the simultation, use or exploitation by other individuals or organizations of the key phrase and term in its corporate title ‘ Anti-Defamation League ’ in order to prevent dilution, impairment, or destruction of the recognized good will built up with respect thereto and the secondary significance thereof ”.
I
The adjudication of the substantive aspects of this litigation is made within an evaluation of prior proceedings and procedural context in which this action was presented for trial as an inquest pursuant to CPLR 3215, when it was assigned following a declaration of default against the defendant league for failure to appear for trial by an attorney as required by CPLR 321 (“ voluntary association shall appear by attorney ”), predicated upon the public policy and specific prohibitions of sections 478 and 495 of the Judiciary Law (Trial Term, Part I [Saypol, J.], Trial, Oct. 17, 1972j.[1] Accordingly, this action was tried and *849 plaintiff, by its counsel, presented testimonial and documentary evidence by a member of the Bar, associated with plaintiff, who has personal knowledge of the facts and plaintiff’s activities during the past 24 years.
The declaration of default and order directing the trial was proper (Oliner v. Mid-Town Promoters, 2 N Y 2d 63, 64; see, also, Weisberger v. Condon, 6 Misc 2d 176 [trial by inquest of a libel action where defaulting defendants who answered did not appear for trial] ). [2] No reason is disclosed or suggested to defer the trial or the entry of judgment under OPLÉ 3215, if warranted by the record because, even assuming, arguendo, that defendant executive director had not disclaimed individual *850 action, as he did, a favorable judgment against him would not inure to the benefit of the defendant league which allegedly has unlawfully simulated plaintiff’s name and symbol. Besides, CPLR 321 is not a shield to withhold or block the exercise of judicial discretion and authority under CPLR 3215. This court’s exercise of jurisdiction cannot be so thwarted.
n
The procedural posture of this litigation requires a threshold evaluation of the scope and nature of the proof and record upon which a determination will be made whether or not to enter judgment, if so warranted by the law, under CPLR 3215. Evidence is required (Cranston v. Walton-164th St. Corp., 115 N. Y. S. 2d 331 [default in action for declaratory judgment] ; 8 ALR 3d 1070). The record here consists of the pleadings, including the verified complaint which “ qualifies as an affidavit attesting to the claim ” (CPLR 3215, subd. [e]), defendants ’ unverified answers, and the evidence presented by plaintiff, the sufficiency and weight of which will also be the subject of evaluation. In addition, an evaluation will be made under CPLR 5015, of matters which a defendant who would oppose plaintiff’s application with sufficient proof to vacate the judgment after entry, to wit: “jurisdiction” (CPLR 5015, subd. [a], par. 4); “excusable default ” (CPLR 5015, subd. [a], par. 1) — whether the defendant league desired to exercise its opportunity and right to defend on the merits of the controversy (Bouxsein v. Bialo, 35 A D 2d 523 [where default is willful, intentional or deliberate, motion to open default denied]; Bridger v. Donaldson, 34 A D 2d 628; Murphy v. Hall, 24 A D 2d 892) —and, in addition, the validity and merits of defenses already asserted by the individual codefendant pro se in his unverified pleadings, answering affidavits with exhibits in the preliminary injunction proceedings, and in his recent amicus brief which he requested be considered (see Krebs v. Raborg, 30 A D 2d 520).
Ill
Jurisdiction over the defaulting defendant league, a voluntary association, is predicated upon personal service of the summons and complaint made personally on March 16,1972, upon its executive director sued in his representative capacity pursuant to section 13 of the General Associations Law, notwithstanding that his title is not president or treasurer as required (see New York Bd. of Fire Underwriters v. Whipple & Co., 36 App. Div. 49,52; Brown v. Cole, 54 Misc. 278 [injunction to restrain defendant, whose title was “ chairman ”]). The individual codefend *851 ant holds a position equivalent to 'a president. Thus, no subsequent challenge to jurisdiction is available under CPLB 5015 (subd. [a], par. 4).
IV
Plaintiff’s corporate title — a coined phrase — restates its “prime” and “immediate object ” directly coinciding with, reflecting and focusing upon contemporary episodes, and with an ‘ ‘ ultimate purpose * * * to secure justice and fair treatment of all citizens alike and to put an end forever to unjust discrimination against any sect or body of citizens.” Plaintiff conducts its affairs through a national office in New York City and 28 regional offices coast to coast, with a professional staff of about 300 men and women and an official lay leadership which makes up its national commission and 43 advisory boards with 4,500 members.
The plaintiff’s budgets and expenditures have multiplied from about $2,000,000 in 1913 to $5,450,000 in 1971. Between 1937 and 1966, for example, it expended about $100,000,000 directly in its own name for its own account and through its chapters and lodges. About 28,425 individuals —more than half from outside the City of New York — contributed to plaintiff in 1971.
In furtherance and implementation of its prime and ultimate purposes, plaintiff publishes and produces, frequently with cosponsors, books and other writings and audio-visual materials which it advertises and distributes. Many relevant publications are cosponsored with major denominations and communications media. Its catalogs compiling the titles and authors of hundreds of its publications and audio-visual materials are made available to subscribers and to the public including schools and other institutions. It publishes the ADL Bulletin with an average circulation of about 106,415.
Plaintiff frequently employs and refers to itself, here and abroad, by its trade name, “ anti-defamation league ”, without the possessory suffix, and by its first letters “ ADL ”. To illustrate : in one publication, the symbol “ ADL ” appears as a reference about 23 times and the trade name about six times, includ-ing an invitation to write for “further information” to the “ Audio-Visual Department Anti-Defamation League * * * or to your nearest ADL regional office ”.
The covers of plaintiff’s programs for annual meetings, testimonial and special award dinners, prominently display “ ADL ” in the center of a circle. Its annual fund raising campaigns are called “ Anti-Defamation League Appeal[s] ”,
*852 Authors of books, magazines and newspaper editorials ¿nd articles frequently refer to the plaintiff by its trade name without a suffix, or, as ADL. Thus, Michael Kane’s Minorities in Textbooks repeatedly refers to ADL ^21 times) and to anti-defamation league (twice). Recent magazine and newspaper reports with regional and national circulation contain 38 references to ADL. The Philadelphia Inquirer recently reported on the “ Anti-Defamation League’s Award of Merit the Long Island Press announced the “ ADL Human Relations Award ”.
The defendant, Arab Anti-Defamation League, is an unincorporated association established on January 1, 1972, simulating part of plaintiff’s title, anti-defamation league, and, adopted as its symbol “ AADL ”. It announced that its “ basic principles ” are to “liberate the human mind from prejudice as the prerequisite for universal peace ” and that “ as the Arab Americans have been subjected to continuous discrimination, smear and character assassination, the League will endeavor to oppose and eliminate the prejudices and discriminatory acts directed against the Arabs ”. It has a national advisory board described as ‘ ‘ multi-racial, multi-religious group of distinguished persons who are university professors, doctors, lawyers, and newspaper editors and publishers ”. Establishment of out-of-State chapters in Philadelphia and plans for a chapter in Colorado have been announced. It solicits contributions.
Significantly, subsequent to its formation, defendant league’s officers have likewise referred to plaintiff by its trade name without the suffix, or, as ADL. Its public relations director stated that “we expect the help and support of ADL ”, A solicitation in the newspaper Action whose executive editor is also the defendant league’s executive director, reads as follows: “ Please Help ‘ AADL vs. ADL,BB ’ ”. In an open letter to plaintiff’s national chairman, the defendant league’s executive director refers to plaintiff interchangeably by its corporate title (six times) and by its trade name (three times). In a letter to the editor of the New York Times in July, 1972, the author makes the following references to plaintiff: Anti-Defamation League and B’nai B’rith “B’nai B’rith and its Anti-Defamation League and as “ Anti-Defamation League ”.
Following the commencement of this action, the defendant league’s executive director wrote in Action, in pertinent part; “ Arab Anti-Defamation League not to be confused or identified with B’nai B’rith Anti-Defamation League ”, and, he further explained that [1] ‘ this statement has been made to clear up any possible confusion that may arise as the result of spine similarity *853 in the names of the two organizations ”, and, he emphasized that defendant is “ not related, affiliated, connected in any way, manner or shape with the Anti-Defamation League of B’nai B’rith or Anti-Defamation League or simply ADL
The defendant association’s executive director makes a side-by-side visual comparison between defendant league’s title with plaintiff’s trade name and between “ AADL ” and “ ADL ” and contends in his “ amicus brief ” that two prerequisites must be met: (1) confusion in the public mind that the new organization is in some capacity identical with the plaintiff; and (2) as a result of the confusion, plaintiff loses financially or otherwise and that plaintiff must also show the exact manner it has suffered damages or loss.
The national and State public policy of freedom of trade traditionally protected by the judiciary at common law, supplemented and regulated by legislation in response to business needs or contemporary economic crises, is predicated upon competition— free and without unreasonable restraints upon the price or supply of goods and services vigorously operating in an open, fair and honest marketplace unencumbered by restrictions and barriers imposed by unfair and fraudulent marketing practices. Trade-marks and trade names were originated and coined in the guilds and by the merchants to identify their products and businesses, respectively, which blended with an association of quality, source or origin and identity, goodwill and reputation of the owner. Imitation or simulation, unless deceptive or confusing, is within the concept of competition. (See Kellogg Co. v. Nat. Biscuit Co., 305 U. S. 111, 122 [“ shredded wheat ” case].)
The rights of action for protection from imitation of technical and nontechnical marks have inherited and derived certain characteristics from the technical distinctions inherent in their respective jurisdictional common-law forums in law and equity. (Pickett & Handler, Trade-Marks and Trade Names — An Analysis and Synthesis, 30 Col. L. Bev. 168, 759; Handler, Unfair Competition, 21 Iowa L. Bev. 175; see Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 674; [e.g., wrongful or fraudulent intent “presumed” by trade-mark infringement; essence of wrong for relief from unfair competition of trade name with secondary meaning to confine use of word to its primary meaning].) Though these distinctions are still evident, suggested as dicta,[3] they have been fading with the trend toward merger of law and equity and modern concepts of trade and commerce. (See Unfair Competition, 53 Harv. L. Bev. 1289, 1296-1298.)
*854 From “passing-off” in English law or “palming-off” in American jurisprudence, the courts have justified injunctions from simulation on noncompeting goods upon a confusion of source of origin (American Foods v. Golden Flake, 312 F. 2d 619, 623); a link with the source or confusion of sponsorship (Taussig v. Wellington Fund, 313 F. 2d 472, cert. den. 374 U. S. 806); or upon the theory of dilution (see General Business Law, § 368-d; N. Y. Legis. Annual, 1954, pp. 49-50 [“ Likelihood of injury to business reputation or of dilution of the distinctive quality of a trade name or trade-mark * * * notwithstanding the absence of competition * * * or the absence of confusion as to the source of goods or services ”]). The dilution approach has been recognized but “ sparingly applied ” by the New York Courts (Cue Pub. Co. v. Colgate-Palmolive Co., 45 Misc 2d 161, 168, affd. 23 A D 2d 829). The New York courts cling to the talismanic standard of likelihood of confusion. (See Tiffany & Co. v. L’Argenne Prods. Co., 67 Misc 2d 384; Lyle Stuart, Inc. v. Pinnacle Books, N. Y. L. J., Oct. 1, 1971, p. 2, col. 6 [plaintiff’s reputation was entitled to protection from association with an unknown mark which might not meet its standards].) (See, also, 36 St. John’s L. Rev. 18^; 3 N. Y. L. Forum 313.) Perhaps these decisions may be attributed to the ambiguity as to the identification of the right of action in either ‘ ‘ dilution ” or “ distinctive quality, ’ ’ and to the absence of definition of the latter phrase with the risk that the statute may be read to grant a monopoly to the first user as a result of stare decisis effect of a judgment.[4] Some courts predicating their relief upon protection of a proprietary right instead of public rights, define the cause of action as “misappropriation” (Vaudable v. Montmartre, Inc., 20 Misc 2d 757, 759; Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 792-795; but cf. Ball v. United Artists Corp., 13 A D 2d 133, 137 [“ legally enforcible rights ”]. Nevertheless, there is a definite trend toward equal evaluation and protection by the scope of relief of trade-marks and trade names. (Restatement, Torts, § 717, p. 565 [a “ trade name is, however, no less effective than a trade-mark as a means of identification ”]; General Business Law, § 368-d [trade-marks and trade names].)
The distinctive identity, principles, programs, activities and reputation of educational, charitable and benevolent associations equally have a right of action against simulation of their names under the general rules of unfair competition. (Benevolent & Protective Order of Elks v. Improved Benevolent & Protective *855 Order of Elks of World, 205 N. Y. 459 [note: members of defendant association were not former members seceding from plaintiff] ; Salvation Army in United States v. Amer. Salvation Army, 135 App. Div. 268; Matter of Boy Explorers of Amer., 21 Misc 2d 114 [compared to “ Boy Scouts ”]; Brooklyn Hebrew Home & Hosp. for Aged v. Jewish Home for Aged & Infirm, 117 Misc. 347, 351-352.) In Cornell Univ. v. Messing Bakeries (285 App. Div. 490, 492-493), the court said that there was no “need to show there has been unfair business ’ competition ” and the “ relief in this general scope has been granted to a patriotic society against the use of an almost identical name * * * to a * Salvation Army ’ * * * to a fraternal order * * * and to a university ”.
The owner of the name or its wdrds, generic or descriptive, is entitled to enforceable rights to its exclusive use, or, as some say, he acquires a property interest, supra, when secondary meaning is established by satisfactory proof that in the minds of the public — in the case at bar, the communication media and members of the public who purchase, receive, read, audit, subscribe to the publications and audio-visual materials of plaintiff, or support its purposes by contributions or otherwise — there is an “ association * * * sufficient to create public sanction for exclusive appropriation ” (Avon Periodicals v. Ziff-Davis Pub. Co., 27 Misc 2d 160, 163). It has also been defined as “ special significance ” (Ball v. United Artists Corp., 13 A D 2d 133, 137, supra); and as the “ indicia of origin ” (Upjohn Co. v. William S. Merrell Chem. Co., 269 F. 209, 211, cert. den. 257 U. S. 638). Thus, upon proof that the trade name has acquired secondary meaning, it qualifies and is entitled to the same protection afforded to a technical trade-mark (Carling Brewing Co. v. Philip Morris Inc., 297 F. Supp. 1330, 1336 [trade name “ synonymous ” with product] ; Avon Periodicals v. Ziff-Davis Pub. Co., supra, p. 163 [secondary meaning defined and “ in this sense, the word becomes the trade-mark of the producer ”] ; Eastern Columbia v. Waldman, 30 Cal. 2d 268, 271 [trade names with secondary meaning equated with “ primary meaning ” so that “ there is little if anything left to distinguish them from a trademark ”]).
The phrase in issue and “ ADL ” by repeated use by plaintiff and the communication media, have acquired the required “ association ” and “ special significance ” with the public, and, indeed, are the “ indicia of origin ” of its publications and audiovisual materials and other activities. They are synonymous with B ’nai B ’rith and plaintiff which naturally prompts their inter *856 changeable use. ‘‘ ADL ” is not only an abbreviated symbol, but it, too, has a synonymous link with B’nai B’rith and plaintiff. (See American Auto. Assn. v. A. A. Auto. Club of L. I., N. Y. L. J., Sept. 27, 1971, p. 18, col. 4 [use of two “ AA’s ” of plaintiff’s ‘ ‘ AAA ’’ enjoined].) Except for his allegation in the unverified answer that he ‘ ‘ lacks sufficient information to form a belief” as to plaintiff’s allegations of facts connoting secondary meaning, the defendant executive director does not deny, disprove or contradict such facts as to the use and repeated reference of the phrase in issue and “ ADL ”. Nor does he allege or demonstrate that they are common, generic or descriptive.
' Proof by extrinsic evidence of actual confusion, deception, misrepresentation, or loss of business is unnecessary. (Hill's Supermarkets v. Stony Brook Dairies, 7 A D 2d 756; Matter of Port of New York Auth. [Cort], N. Y. L. J., May 23, 1972, p. 19, cols. 6, 7 [use of “ World Trade Center ” enjoined even if there is no deliberate attempt to exploit ”; “ clear possibility of confusion on the part of the public ”].) Instead it is sufficient if confusion is “ likely ” (Oakite Prods, v. Bo ritz, 161 Misc. 807, 809); or its ‘ ‘ likelihood ’ ’ (Bennett Bros. v. Floyd Bennett Farmers Market Corp., 22 Misc 2d 833, 837); or its “ tendency ” to deceive (Rochester Sav. Bank v. Rochester Sav. & Loan Assn., 170 Misc. 983, 986). This is an action for an injunction, not an action to recover damages[5] as in Ball v. United Artists Corp., 13 A D 2d 133, supra [summary judgment denied]). In section 368-b of the General Business Law the test for infringement of a registered trade-mark is stated as: “ likely to cause confusion or mistake or to deceive as to the source of origin of such goods or services ”. World Press v. New World Press (Sup. Ct., N. Y. County, Index No. 19529/1968), relied on by defendant executive director as precedent for proof of the exact manner confusion resulted, which involved an action under section 133 of the General Business Law (requiring proof of “ intent to deceive or mislead the public ”) against the defendant who alleged he was the first user and registered the mark prior to plaintiff, is obviously not here relevant or controlling.
Though likelihood of confusion is technically an issue of fact, it is nevertheless an issue of law for the court based upon its objective analysis, comparison and judgment. (Venetianaire Corp. of Amer. v. A. & P. Import Co., 302 F. Supp. 156.)
The phrase in issue and “ AADL ”, adopted by the defendant league, are’similar. Similarity is the test. Similarity, visual *857 or auditory, is a matter of impression. (Diesel Oil & Burner Corp. of N. Y. v. New York Diesel Heating Corp., 197 Misc. 598, 600, affd. 277 App. Div. 881.) The similarity of the plaintiff’s phrase in issue and symbol adopted by the defendant league; the use of the phrase in issue and “ ADL ” by the communication media, coupled with a long and virtual exclusive use by plaintiff for six decades, together with some evidence of actual confusion, adequately substantiate a finding of likelihood of as to source. There is also a possibility of a link to plaintiff to a casual, observer by the similarity of the phrase in issue and the symbol, which have been interchangeably so used by defendant.
Moreover, there is extrinsic evidence of likelihood of confusion. The defendant executive director’s disclaimer and caution in his newspaper Action that ‘ ‘ Arab Anti-Defamation League not to be confused or identified with B ’nai B ’rith Anti-Defamation League ” explaining that “ this statement has been made in order to prevent any possible confusion that might arise as the result of some similarity in the names of the two organizations ”, is “ pregnant with admission” (Vaudable v. Montmartre, Inc., 20 Misc 2d 757, 758, supra) and fails as a defense since it manifests that without explanation, confusion or deception might result (Esso v. Standard Oil Co., 98 F. 2d 1, 7 [“ Not to be confused with Standard Oil Company ”, deemed admission]).
The “ survey” to which the defendant executive director refers, a random sampling of opinions from subscribers to his newspaper, is insufficient and without statistical reliability to rebut the intrinsic and extrinsic evidence of likelihood of confusion of source of origin or sponsorship. (King Research v. Shulton, Inc., 324 F. Supp. 631, 636; Lerner Stores Corp. v. Lerner, 162 F. 2d 160,162; see Caughey, The Use of Public Polls, Surveys and Sampling as Evidence in Litigation, and Particularly Trademark and Unfair Competition Cases, 44 Cal. L. Rev. 539.)
The defendant league’s ethnic prefix does not save it. Besides, the prefix is not distinctively evident in “ AADL ”. The addition of the infringer’s name to another’s trade name with a strong secondary meaning, as in the case at bar, may be deemed an ‘ aggravation and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the true proprietor ” (Menendez v. Holt, 128 U. S. 514, 521; Gillott v. Esterbrook, 47 Barb. 455, affd. 48 N. Y. 374 [defendant appropriated 303 ” trade-mark, adding its name; enjoined]; Jacobs v. Beecham, 221 U. S. 263, 272 [ the state *858 ment that the defendant makes [product] does not save the fraud ”]; Champion Spark Plug Co. v. Champion, 23 F. Supp. 638, 640). Similarly, a geographic prefix is not sufficiently distinctive. (Society of War of 1812 v. Society of War of 1812 in State of N. Y., 46 App. Div. 568, 571; Jenkins Pub. Co. v. Metalworkers Pub. Co., 315 F. 2d 955, 959.) Much more is required. (See Commercial Advertiser Assn. v. Haynes, 26 App. Div. 279, 280 [trade name “ commercial ” accompanied by words “ New York ” and retention of title to weekly newspaper in “ conspicuous letters immediately beneath * * * new name ” held sufficient].)
The phrase in issue is not descriptive of a generic type or classification of an organization like a “ chamber of commerce ”, as suggested, whose purposes are defined and regulated by statute (e.g., Not-For-Profit Corporation Law, § 1410; “ Boards of trade and chambers of commerce [to foster] interests of those having a common trade ”). Plaintiff is not a trade association with heterogeneous affiliates. It- is unlike Association of Contr. Plumbers of City of N. Y. v. Contracting Plumbers Assn. of Brooklyn & Queens, 302 N. Y. 495, 502), where the phrase “ Contracting Plumbers Association ” was used Nationwide and the national association encouraged its use by all groups affiliated with it so that it did not acquire secondary meaning. Since the phrase in issue and “ ADL ” are synonymous with plaintiff and B’nai B’rith, as evidenced by the frequent reference to B’nai B’rith’s anti-defamation league, supra, and with its purposes, the defendant association’s addition of an ethnic prefix to the trade name is as confusing — likely and actually — to the public, including members and nonmembers of plaintiff, just as it would be if the defendant league or any other homogeneous group added its descriptive prefix to B ’nai B ’rith or if the latter were added to plaintiff’s title.
Besides, the parties are organizations with purposes and objectives with intangible bonds and meanings to their respective memberships and to the public. Thus, in Master v. Machen (35 Pa. D. & C. 657, 664), involving the adoption of a name of a church with “ close similarity ” which raised an “ inference of resulting confusion ”, the court held that “ any project or movement of another religious organization using a name so similar to an established one as to create confusion and thereby interfering with the spiritual and financial progress of that established church and its agencies is inequitable and will be restrained,
*859 Dilution may be weighed in the whole context with likelihood of confusion in a somewhat different sense than under the concept of multiplying uses in the antidilution statute. For example, in Cornell Univ. v. Messing Bakeries (285 App. Div. 490, 492, supra) the court premises its injunction on the “ theory ” that an “ educational institution which has won large public prestige * * * ought not * * * have that prestige diluted by a commercial use of its name, suggesting connection or benefit to the institution from the enterprise ”. There is no suggestion or defense that the defendant association’s use of the phrase in issue or symbol will enhance plaintiff’s reputation or trade name. (See Avon Shoe Co. v. David Crystal, Inc., 279 F. 2d 607, 614, cert. den. 364 U. S. 909 [consideration that defendant’s reputation has enhanced value of plaintiff’s mark].) As in Matter of Boy Explorers of Amer. (21 Misc 2d 114, 118, supra), there is nothing to indicate that defendant league’s use will add ’ ’ to plaintiff’s ‘ ‘ program ’ ’. The promotion of co-operation and harmony instead of a “ spirit of rivalry ” (Brooklyn Hebrew Home & Hosp. for Aged v. Jewish Home for Aged S Infirm, 117 Misc. 347, 352, supra) is here paramount.
An evaluation under the public policy promoting preservation and availability of resources — natural and literary — in the public domain and the public policy of a fair market place for products, services, publications and ideas without unfair practices, which policies are not inconsistent, demonstrates no compelling reason to deny or withhold plaintiff’s right of action to enjoin simulation of its name and symbol which it coined and used exclusively for about six decades. In this sense, there is neither a grant of a monopoly to plaintiff nor any infringement of the constitutional rights of the defendant association’s members. The scope of relief in unfair competition litigation involving trade names commensurate with its jurisdictional origin is targeted to the prohibition of the confusion or deceit on the public. However, the scope of relief here must be extended to the imitation and simulation of the trade name and symbol since any possible qualification such as “ not connected or affiliated with ” is inadequate and indeed may compound the existing confusion. (See Westphal v. Westphal’s World’s Best Corp., 216 App. Div. 53, 67, 71, affd. 243 N. Y. 639; Johnson & Son v. Johnson, 116 F. 2d 427, 430 [such phrase deemed “ severe; it not only advertises the injured party, but directly suggests that the defendant has been found guilty of some unfair practice ”].) This adjudication is predicated upon the paramount public interest to protect the authenticity, reputation and credibility of an *860 association’s official policies, publications, and activities in the implementation of its purposes which may likely be confused and blurred by the diversion of attention. There is no overriding conflict with the public policy to foster and maintain competition, because the parties are not engaged in business and commerce for profit.
The injunction will provide effective relief against the immediate injury resulting from orthodox confusion. But plaintiff seems to have alleged as a tagalong, the equitable principle of “ dilution of the significance of its corporate name,” because, if it acquiesces to defendant’s use, it “ may well anticipate” that others will follow defendant’s example. It appears to invoke the antidilution statute (General Business Law, § 36&-d; citing 3 Callman, Unfair Competition Trademarks and Monopolies [3d ed.], § 84.2, pp. 954-955), which supports the “ dilution theory ” incorporated in the antidilution statute.[6] Apart from the fact that plaintiff does not cite the statute, it does not allege or attempt to demonstrate any “distinctive quality” beyqnd proof of a strong secondary meaning. In any event, the effects of probable multiplying uses increasing the likelihood of confusion which, if permitted, would spread and inevitably completely dilute and destroy the value of plaintiff’s trade name and *861 its secondary meaning, appear too remote to predicate the injunctive relief under the antidilution statute. Moreover, in the absence of a per se rule, it has an adequate remedy to litigate on a case-by-case basis as required. Since there is likelihood of confusion in the defendant league’s use of the phrase in issue and the symbol “ AADL,” similar to plaintiff’s “ ADL,” it is not really necessary to consider whether the injunctive relief is here justified without the likelihood of confusion under section 368-d of the General Business Law (Gold Master Corp. v. Miller, 380 F. 2d 128,130, n. 1).
V
Plaintiff who seeks a judgment under CPLR 3215 must present proof at the minimum of a prima facie cause of action. Fifteenth Annual Report of N. Y. Judicial Conference, 1949, p. 302 — proof to the satisfaction that the cause of action is substantial and bona fide (ibid., p. 315.) (See, also, Matter of Sullivan, 65 Misc 2d 461, 465 prima facie showing ”]; Imperial Discount Corp. v. Aiken, 38 Misc 2d 187, 188 [ minimum measure of proof to sustain its cause of action ’ ’ and a recovery to which a plaintiff is justly and fairly entitled ”].) Nevertheless, the nature of the remedy by permanent injunction compels that judgment be made only in aclear and convincing manner ” parallel to the test applicable to the statutory summary proceeding under sections 133 and 135 of the General Business Law. (See Association of Contr. Plumbers of City of N. Y. v. Contracting Plumbers of Brooklyn & Queens, 302 N. Y. 495, 498, supra.) Plaintiff meets this test.
VI
The record discloses a laudable spirit of co-operation between the parties’ counsel in an attempt to reach an amicable resolution and avoid litigation over a name between two organizations engaged in civil rights.”[7] The circumstances here reasonably warrant the conclusion of an intent and election by the defendant association’s governing body not to defend, which may be deemed as the absence of “ excusable default ” (CPLR *862 5015, subd. [a], par. 1). No reason or difficulty or burden has been suggested in the selection of another name which may, perhaps, be even more significant and appropriate to the defendants. The defendant executive director cannot expect, under a juridical approach which necessarily must be taken in such litigation, that he may prevail against another who has originated the name and used it virtually exclusively for six decades which, upon the finding of the essential and traditional criteria, equity must and will protect.

. The action was commenced by service of the motion by order to show cause for a preliminary injunction with the summons and verified complaint upon the defendant league’s executive director who is also named as a codefendant “individually” (General Associations Law, § 13). The codefendant Keljik allegedly “has no connection” with the defendant league “as he had resigned prior to the action ”, Negotiations for an amicable resolution reached a stalemate when the defendant executive director refused as reported by the defend *849 ant league’s “ legal advisor ” who then withdrew (see note 7 infra). Nevertheless, the defendant executive dirctor pursued his advocacy in opposition pro $e and purported to appear and represent the defendant league. This procedural default was called to the court’s attention after the defendant executive director filed the note of issue (Tr., Oct. 17, 1972, Trial Term, Part I [Say-pol, J.]). Following inquiry relating to the defendant’s adequacy of compliance with the preliminary injunction (May 5, 1972, Stabke, J.) and with other statutory requirements, the plaintiff renewed its motion to sever as against the individual defendant (CPLR 3215, subd. [a]; C 3215:4]) which the court recalled it had previously granted. The court then declared a default against the defendant association for which no appearance by an attorney was made or filed. -The action was then assigned to this Trial Term for trial as an inquest against the defendant association (CPLR 3215). Though the defendant executive director attended and monitored the trial, no appearance was or could be made on behalf of the defendant league (Davis v. Boss, 259 App. Div. 577, 580, mot. for rearg. & lv. to app. den. 259 App. Div. 1029).

. The exercise of discretion declaring a default under CPLR 321 may be deemed reasonable and warranted by the plaintiff’s need for immediate relief and to assure and preserve the finality of any judgment, particularly under the circumstance involving a voluntary association whose defense is no longer advocated by its legal advisor who withdrew, and without any circumstances from which an intention to defend on the merits may reasonably be inferred. The defendant executive director’s appearances and advocacy have been pro se without any indication of any express or implied authority to similarly act on behalf of the officers and members of the defendant league. Severance in multidefendant situations is provided and authorized by subdivision (a) of CPLR 3215 (McKinney’s Cons. Laws of N. Y., Book 7B, CPLR 3215, C.3215:4), particularly in the absence of joint liability. Here the executive director in his pleadings expressly disclaims and “ denies that he acted in his individual capacity.” His joinder and representative designation for procedural convenience of service of process (Martin v. Curran, 303 N. Y. 276, 281; Bobe v. Lloyds, 10 F. 2d 730, cert. den. 270 U. S. 663; see, also, Torres V. Lacey, 5 Misc 2d 11, mod. on other grounds 3 AD 2d 998, mot. for rearg. den. 4 A D 2d 831), and for securing in personam jurisdiction over the defendant league under section 13 of the General Associations Law, does not satisfy or provide compliance with the mandatory requirement of CPLR 321. In reality, the action is against the defendant league (Smith v. Robilotto, 27 A D 2d 684, 685 [“similar to action against a corporation’ ]).

. 30 Harv. L. Rev. 759, 770.

. See n. 7, infra.

. The demand for “compensatory or punitive damages” was withdrawn (Tr., Oet. 24,1972, p. 3).

. The dilution theory originated in a 1924 German ease involving the identical mark “ ODOL ” in steel products and mouth-wash and was introduced into American jurisprudence by Schechter, The Rational Basis of Trademark Protection (40 Harv. L. Rev. 813, 831 [1927]; See Brown, Advertising and the Public Interest: Legal Protection of Trade Symbols, 57 Yale L.J. 1165, 1191, n. 103 [1948]). There is no per se rule that the first user acquires an exclusive property right in a trade name. Though attention appears to be focused upon the word “dilution” (General Business Law, § 368-d), it may be the effect of simulation of a mark or name with “ distinctive quality ” which is the true right of action. Thus, a new category of business identification like celebrated marks may have been recognized where the quality of the mark transcends that of the product in its advertising and demand appeal to the public. However, in Johnson & Son v. Johnson, 116 F. 2d 427 [claim on reputation with customers and possible expansion] court said (p. 429): “ There is always the danger that we may be merely granting a monopoly, based upon the notion that by advertising one can obtain some ‘ property ’ in a name”. Caution and restraint in its application should be exercised except in special situations involving fanciful and unique marks, lest it be deemed by stare decisis effect to establish a per se rule. However, in trade-mark infringement and unfair competition litigation, each case is decided on its own particular fact pattern (Fisher v. Blank, 138 N. Y. 244, 252) even though precedent is not only difficult to ascertain, but, in many instances, “ seem incomr' patible”) (Dell Pub. Co. v. Stanley Pub., 9 N Y 2d 126, 133). Besides, the case-by-case approach provides the necessary periodic review of the present relevance 'and economic conditions in support of legislatively created exclusive rights and immunities which tend to become perpetual.

. Letter from defendant league’s “ legal advisor ” to plaintiff’s counsel dated April 3, 1972: “Please be advised that I have withdrawn from representing any of the .defendants in the above-entitled action under Index No. 5559 after my effort to persuade Dr. T. Mehdi to settle the lawsuit has failed. As you know, and I had stated this in the record on the return date of your order to show cause, I had not appeared in this action and my sole interest is to bring about a mutual agreement as I did not believe that two organizations engaged in civil rights should be in litigation over a name regardless of the merits of either side.”