**EXQUISITE FORM INDUSTRIES, INC., Plaintiff,**

v.

**EXQUISITE FABRICS OF LONDON and Hamilton Adams Imports, Ltd., Defendants.**

**No. 72 Civ. 3151.**

United States District Court,
S. D. New York.

July 24, 1974.

Lackenbach & Lackenbach, Mamaroneck (Armand E. Lackenbach, Mamaroneck, N. Y., of counsel), for plaintiff.

Burns, Kennedy, Schilling & O'Shea, New York City (Edward D. Burns, New York City, of counsel), for defendant Hamilton Adams Imports, Ltd.

## OPINION

BAUMAN, District Judge.

This is an action for trademark infringement and unfair competition, brought pursuant to the Lanham Act, 15 U.S.C. § 1051 et seq., § 368–d of the General Business Law of New York, McKinney's Consol.Laws, c. 25, and the common law of unfair competition. Jurisdiction is properly vested in this

court pursuant to 15 U.S.C. § 1121[1] and 28 U.S.C. § 1338.[2] The case was tried before this court, sitting without a jury, and what follows constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Exquisite Form Industries (hereafter "Exquisite Form") is a New York corporation with its principal place of business in New York City. Since approximately 1945 it has been engaged in the manufacture and sale of women's underwear, principally brassieres, garter belts and girdles; in more recent years it has also marketed swim trunks, women's body shirts, and men's hosiery.[3] Over the past twenty-five years its sales have totalled approximately $375,000,000, and it has expended over $30,000,000 for advertising. Its products are publicized widely: on television and radio, in newspapers and magazines, and in department store displays.

Exquisite Form is the owner of two trademarks, both duly filed with the United States Patent Office. The first, No. 592,771, was registered on July 20, 1954. The mark is "Exquisite Form", written in script with only the "E" and "F" capitalized and particularly prominent. Many of the Exquisite Form labels submitted in evidence closely approximate this mark. The registration form notes that the mark is to be used for brassieres, garter belts, and girdles.

The other trademark, No. 642,681, was registered on March 12, 1957. It is simply the word "Exquisite", in block capital letters. This, too, is specified for use with brassieres, garter belts, and girdles. An affidavit of continued use and incontestability, pursuant to §§ 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058 and 1065, was filed for No. 642,681 on April 2, 1962. The record does not disclose whether such an affidavit was filed for No. 592,771.

Hamilton Adams Imports, Ltd. (hereafter "HAIL"), the only defendant to have appeared in the action,[4] is a Delaware corporation with offices in New York City. It is engaged in the importation of fabrics from various European countries, principally Ireland, England and France, and their distribution in the United States. Its principal customers are fabric departments of stores and manufacturers of women's outer garments. HAIL is now a subdivision of Moygashel Linens, an Irish corporation, which is in turn owned by Courtaulds, Ltd., a British corporation. Among the manufacturers from whom HAIL makes purchases is Exquisite Knitwear, Ltd., a British corporation, also a subsidiary of Courtaulds. Since 1969 it has purchased acrylic double knits from Exquisite Knitwear; such purchases account for perhaps 10% of HAIL's imports. The knits are purchased as "piecegoods"; that is, in 60 yard rolls. The fabric

1. 15 U.S.C. § 1121 provides:
   "The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties."

2. 28 U.S.C. § 1338 provides:
   "(a) The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, copyrights and trade-marks. Such jurisdiction shall be exclusive of the courts of the states in patent and copyright cases.
   (b) The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade-mark laws."

3. Exquisite Form manufactures its own knit fabrics, primarily in its mills in Puerto Rico. Such fabrics are not sold to other companies, and are used exclusively in the production of Exquisite Form's own products.

4. Plaintiff claims to have effected service on the other defendant, Exquisite Fabrics of London, which has never appeared or answered. Its default was noted by the Clerk of the Court on August 24, 1972 and plaintiff now seeks a default judgment against it. This point will be explored more fully in Part V of the opinion.

weighs between 14 and 16 ounces per square yard and is considered rather "heavy". It is sold to women's garment manufacturers for use in women's slacks, skirts, dresses and coats. Because of its weight, it is not used in the manufacture of women's undergarments. Although both HAIL and Exquisite Knitwear are subsidiaries of Courtaulds, the president of HAIL testified, without contradiction, that their dealings are at arm's length.

The instant controversy originated with the appearance of an advertisement in the May 20, 1970 issue of Women's Wear Daily, a publication with an extensive readership in the garment industry. In it, HAIL announced "a new line of knitted fabrics for Spring 1971", which was further identified as "the most extraordinary collection of new knits from one of the finest fabric houses, Exquisite Knitwear Ltd., of England." The advertisement prompted a letter from Exquisite Form's counsel to HAIL, stating that Exquisite Form believed that HAIL was infringing its rights in the use of the name "Exquisite", and demanding that HAIL desist from such use. HAIL's counsel replied, also by letter, that he believed that Exquisite Form's mark was in no way infringed by HAIL's advertisement, and that HAIL would not refrain from the use of the name "Exquisite". The matter apparently remained dormant thereafter until the appearance of two more ads for Exquisite Knitwear in Women's Wear Daily, on June 7 and June 21, 1972. The advertisements, one of which is reproduced in full in the margin,[5] refer repeatedly to HAIL's product as "Exquisite", without the inclusion of any noun which the adjective modifies. One of them begins by saying, "We're Exquisite. The largest double-knitters in Europe."; the other states, for example, that "Exquisite will give your range a different, unique look in a crowded market." The full name is given only in the lower right hand corner of each advertisement. One, that of June 7, identifies the advertiser as Exquisite Knitwear Limited; the other, that of June 21, as Exquisite Fabrics of London. In each ad, furthermore, the word Exquisite—and Exquisite only—appears in the lower right hand corner in bold face script, in what plaintiff contends is a copy of Exquisite Form's logo. The instant action was commenced shortly after the appearance of these advertisements.

The complaint alleges four causes of action. The first charges the defendants with infringing plaintiff's "Exquisite" trademark (No. 642,681) in viola-

5. The advertisement of June 21, 1972 reads as follows:

"EXQUISITE MAINTAINS A HUGE ACRYLIC DOUBLE-KNIT STOCK.

We ship fast from a stock of 30 beautiful fiber-dyed colors.

We're Exquisite. The largest double-knitters in Europe. Producing the finest range of European-inspired acrylics on the market.

We produce our own fiber, spin our own yarn, utilize a unique fiber-dying process. This control helps give our acrylics exceptional handle and appearance.

And to support our world-wide distribution, we maintain a constant stock of over 30 vibrant, fiber-dyed colors in plain goods. All ready to go, all the time. So we can rush you your order fast. (That's very important, since this fall will be tremendous for acrylics.)

Exquisite plain goods are a fully useable 68–70 inches wide, and we make allowances for faults. (You don't pay for fabric you can't use.) And you buy F.O.B. New York the same way you make any domestic purchase.

When it comes to fancies, we have a huge jacquard knitting capacity. So we can produce your special order fast. What you order will be special, too. Our fancy double-knit acrylics are designed in London and Paris, which means they'll give your garments a unique look in this crowded market. And fiber-dying guarantees perfect mix and match.

So for Europe's biggest range of top acrylics, call Exquisite now. And make sure you're not caught short this fall.
                                        Exquisite
Exquisite Fabrics of London, 24 West 40th St., New York, N.Y. 10018"

tion of 15 U.S.C. § 1114(1).[6, 7] The second, presumably invoking common law doctrines of unfair competition, charges defendants with counterfeiting, copying, and colorably imitating plaintiff's "Exquisite" trademark and its logo. The third alleges that defendants employed false descriptions and false designations of origin in connection with its products in violation of 15 U.S. C. § 1125(a).[8] Finally, the fourth count alleges that defendants have injured plaintiff's business reputation and diluted the quality of its trademark in violation of § 368—d of the General Business Law of New York.[9] HAIL denies all of the material allegations of the complaint

and argues that Exquisite Form's two year delay in commencing suit following the initial advertisement in May, 1970 constitutes laches and must preclude the maintenance of the action.

## I.

I turn first to Count 1, which would appear to have been the focus of plaintiff's concern in his written presentations to this court and at the trial. The standard for determining trademark infringement under § 1114(1) is now a familiar one, embodied in the very language of the statute: is the designation or mark on defendants' product likely to cause confusion with plaintiff's trade-

6. 15 U.S.C. § 1114(1) (§ 32(1) of the Lanham Act) provides:
    "(1) Any person who shall, without the consent of the registrant—
    (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
    (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive."

7. In the interests of accuracy it should be noted that Count 1 makes no mention of § 1114(1); the only statute mentioned (other than those pertaining to jurisdiction) is § 1125(a), which forms the basis of the allegations in Count 3 and is also mentioned there. It is nevertheless tolerably clear that plaintiff intended to plead a cause of action under § 1114(1) in the first count. It is described as a "cause of action . . . for

trademark infringement under the trademark laws of the United States", and is, indeed, referred to in plaintiff's trial memorandum as one arising under § 1114(1). The complaint may thus be deemed amended by the trial memorandum.

8. 15 U.S.C.A. § 1125(a) provides:
    "(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

9. § 368–d of the General Business Law provides:
    "Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."

mark? S. C. Johnson & Son v. Johnson, 175 F.2d 176 (2nd Cir.), cert. denied, 338 U.S. 860, 70 S.Ct. 103, 94 L. Ed. 527 (1949); Telechron, Inc. v. Telicon Corp., 198 F.2d 903 (3rd Cir. 1952); Villager, Inc. v. Dial Shoe Company, 256 F.Supp. 694 (E.D.Pa.1966). As has already been pointed out in the statement of facts, plaintiff's products do not compete with those of the defendants; nevertheless, it is now well established that a plaintiff may still prevail in an infringement action if defendant's product is "sufficiently similar to make confusion likely." Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2nd Cir. 1953); G. B. Kent & Sons v. P. Lorillard Co., 114 F.Supp. 621 (S.D.N.Y.1953), affd., 210 F.2d 953 (2nd Cir. 1954). The determination of "likelihood of confusion" has an inescapable element of subjectivity. The court, it has been often said, must seek to approximate the perceptions of an ordinary purchaser in arriving at its determination. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609 (7th Cir. 1965); Vitarroz Corp. v. River Brand Rice Mills Inc., 266 F.Supp. 981 (S.D.N.Y.1967). The process of decision, however, necessarily involves more than a simple visual comparison of plaintiff's and defendant's marks *in vacuo*. We have been frequently reminded by our Court of Appeals that the determination involves a careful weighing of various factors which can give context to the immediate controversy. These factors were set forth by that court in Polaroid Corporation v. Polarad Electronics Corp., 287 F.2d 492 (2nd Cir. 1961):

> "Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of the defendant's good faith in adopting its own mark, the quality

of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account. American Law Institute, Restatement of Torts, §§ 729, 730, 731." 287 F.2d at 495.

See also, Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196 (2nd Cir. 1962); Syntex Laboratories, Inc. v. Norwich Pharmacal Co., 315 F.Supp. 45 (S.D.N.Y.1970). The *Polaroid* analysis of the relevant variables will serve as a point of departure for my determination of the likelihood of confusion here.

The first to be considered is the "strength" of plaintiff's mark. The concept of strength and weakness, as one commentator has noted, "is, at best, amorphous and not susceptible of easy definition." [10] Furthermore, the definitions verge on the tautological: strong marks are those entitled to extensive protection against infringement, weak marks those which are not. Nevertheless, it is now generally agreed that strong marks are those which are "conspicuously distinctive"; [11] they tend to be coined or fanciful words, such as Kodak or Polaroid, that are purely the product of invention. Weak marks, on the other hand, are generally generic or descriptive of the product. W. E. Bassett Company v. Revlon, Inc., 354 F.2d 868 (2nd Cir. 1966); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F. 2d 495 (2nd Cir. 1962). Marks are deemed descriptive "if they naturally and normally direct attention to the qualities, ingredients, appearance, effect, purpose, or other features of goods or services. . . ." 3 Callman, *supra* § 71.1. Marks merely descriptive of quality are not usually entitled to extensive protection against infringement. Norm Thompson Outfitters, Inc. v. General Motors Corp., 448 F.2d 1293 (9th Cir. 1971). A "weak" or descriptive

10. 3 Callman, Unfair Competition, Trademarks and Monopolies § 82.1(1).

11. Id.

mark, however, may become entitled to protection if it acquires a "secondary meaning". A secondary meaning exists when a party through advertising, massive exposure, or the distinctive quality of its product has established its mark in the minds of consumers as an indication of origin from one particular source. F. S. Services, Inc. v. Custom Farm Services, Inc., 471 F.2d 671 (7th Cir. 1972). Hence an evaluation of the extent of protection to be afforded a mark involves a two step process. The determination of whether the mark is "strong" or "weak" involves little more than an examination of the mark's intrinsic qualities, and an explanation of how such qualities have been evaluated by other courts. The determination of secondary meaning, however, is largely a factual inquiry: the court must ascertain the range and extent of the mark's associations, and whether the public identifies it with its product. It would then be only a slight oversimplification to conclude that the strength of a mark is a question of law, and its secondary meaning a question of fact.

■ I do not think it can be seriously disputed that plaintiff's mark is intrinsically weak. It should be noted at the outset that plaintiff only claims infringement of its "Exquisite" trademark, No. 642,681; its complaint makes no mention of its "Exquisite Form" mark, No. 592,771. Hence my sole focus here is necessarily on the strength of the word "Exquisite", not of "Exquisite Form". "Exquisite", it would seem, fits readily into the category of so-called laudatory words that have not been given extensive protection against infringement in our Court of Appeals. In Supreme Wine Co. v. American Distilling Co., 310 F.2d 888 (2nd Cir. 1962), the court held the word "Supreme" "so totally lacking in distinctiveness, originality, and uniqueness that, in the absence of compelling proof that it has acquired a secondary meaning to the buying public, it is not entitled to trademark protection." The court proceeded to define

the requisites for such protection in the following manner:

"In order to qualify for trademark protection, a mark must be distinctive, that is, it must be capable of distinguishing the user's goods from others. Merely laudatory words, such as 'best', 'outstanding', or 'supreme' cannot of their own force indicate the source or origin of the labeled goods."

See also, Burmel Handkerchief Corp. v. Cluett, Peabody & Co., 127 F.2d 318, 29 CCPA 1024 (1942); Hiram Walker & Sons v. Penn-Maryland Corp., 79 F.2d 836 (2nd Cir. 1935); Royal Silver Manufacturing Co. v. National Silver Co., 61 F.Supp. 232 (S.D.N.Y.1945).

As a laudatory word, "exquisite" *per se* is entitled to no trademark protection. A further index of its weakness is the extent to which it is employed by other concerns, to identify other types of goods and services. Cf. Triumph Hosiery Mills, Inc. v. Triumph International Corp., 308 F.2d 196 at 199, fn. 2 (2nd Cir. 1962). It is undisputed here, for example, that the Manhattan, Bronx, and Brooklyn telephone directories contain at least a dozen listings of concerns whose names begin with "Exquisite" aside from the plaintiff and the defendant. Such widespread usage further undermines any pretense of distinctiveness which plaintiff might claim for it.

■ The weakness of the mark, of course, is not fatal if the owner can establish a secondary meaning. Plaintiff's burden, then, was to show that the relevant class of consumers associated "Exquisite" with brassieres, girdles, etc. so as to raise the term above the level of simple laudation and give it an independent identity. I am compelled to conclude that plaintiff's evidence is insufficient to justify any such finding. One element in establishing a secondary meaning is the amount of advertising undertaken in support of the mark. Miss Universe, Inc. v. Patricelli, 408 F.2d 506 (2nd Cir. 1969). Plaintiff has shown that over $30,000,000 has been

expended in advertising its products over the past 25 years; it has further introduced into evidence extensive schedules for radio and television advertising in various areas across the country. Naked advertising statistics, however, are insufficient to establish secondary meaning. Little or no evidence was presented regarding the nature and quality of the advertising, or the likelihood of its inducing strong customer identification of the mark with the product. This deficiency is particularly acute in view of the fact that some of plaintiff's products are marketed under the trademarks "Mandate" and "Magic Lady", in packaging that scarcely makes mention of "Exquisite" or "Exquisite Form". The advertising statistics submitted give no indication of how the products are presented, or the extent of the emphasis given the various marks.

Furthermore, a mere showing of advertising does not provide a basis for determining the extent of customer awareness of a mark; such awareness, of course, is at the core of the term "secondary meaning". As the Ninth Circuit has stated, "[t]he test of secondary meaning is the effectiveness of the effort to create it, and the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him 'a single thing coming from a single source?'" Carter-Wallace, Inc. v. Proctor & Gamble Company, 434 F.2d 794 (9th Cir. 1970). See also, Aloe Creme Laboratories, Inc. v. Milsan, Inc., 423 F.2d 845 (5th Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1818, 26 L. Ed.2d 90 (1970); Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). An example of the kind of showing necessary can be found in Hiram Walker & Sons v. Penn-Maryland Corp., supra, in which the plaintiff submitted affidavits of several bartenders and liquor store proprie-

tors stating that they invariably served plaintiff's product whenever a customer sought "Imperial" whiskey. Such a showing was deemed inadequate by the court in *Hiram Walker*; plaintiff here has fallen far short of that.[12] There is, in short, nothing in the record that permits me to conclude that "Exquisite" has become synonymous with plaintiff's products in the mind of the buying public. I must therefore conclude that plaintiff's mark is a weak one, and entitled only to protection of an exceedingly narrow scope. Proxite Products, Inc. v. Bonnie Brite Products Corp., 206 F. Supp. 511 (S.D.N.Y.1962).

The next variable to be considered is the proximity of the products. Plaintiff and defendant obviously manufacture dissimilar products for dissimilar markets. Exquisite Form manufactures and sells finished goods, which are primarily sold to retail customers. The focus of their advertising is those customers, as witnessed by their extensive expenditures for radio and television. HAIL, on the other hand, sells only piece goods under the "Exquisite Fabrics" mark; these goods are sold in sixty yard rolls to garment manufacturers and fabric departments of stores. Their only advertisements submitted in evidence appeared in Women's Wear Daily, essentially a trade journal which has only recently developed a "retail" readership. The fact that the products are not identical is not fatal to plaintiff's claim if they are sufficiently similar as to create a likelihood of confusion. The question, then, is what constitutes sufficient similarity?

The standard of similarity that has evolved is not easy to define, but, as I understand it, can be expressed as follows. Products will be deemed "sufficiently similar to create a likelihood of consusion" if they fall within the same general market, or appeal to essentially

---

12. I cannot, for example, attach much significance to the testimony of plaintiff's advertising and sales promotion director, Robert Paino, that the general public frequently refers to plaintiff's products as "Exquisite" (Tr. 66–67). For there is not the slightest indication that his duties involve him in any contact with the general public, or with retail or wholesale customers.

the same class of consumers. For example, in Pure Foods v. Minute Maid Corp., 214 F.2d 792 (5th Cir. 1954), the court found a sufficient similarity between Minute Maid frozen juice concentrates and Minute Made frozen meats. It reasoned that both products were sold in frozen food departments of retail stores, often close to one another, and such proximity was likely to confuse purchasers. Like reasoning was used to support a finding of similarity between women's undergarments and women's outerwear in Fancee Free Manufacturing Co. v. Fancy Free Fashions, 148 F. Supp. 825 (S.D.N.Y.1957). In Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2nd Cir. 1953), a sufficient similarity was found between televisions and refrigerators on the one hand, and electric sewing machines and vacuum cleaners on the other, on the grounds that all were "electrical household products".

The common thread in these cases, as I have already suggested, is that these disparate products were viewed as appealing to the same group of consumers; hence the possibility of confusion. The same cannot be said for the products in question here. There is little, if any, overlap between those who buy plaintiff's products and those who buy defendant's. Plaintiff's sole argument in rebuttal is that both it and the defendant sell "knitwear", if the term is defined expansively. Although both do admittedly market knit goods, the resemblance ends there: plaintiff's goods are finished products, defendant's nothing but uncut fabric. The force of plaintiff's argument is diminished further by the fact that the trademark "Exquisite" has had its largest and most significant identification with girdles, garter belts, and brassieres, which are not knitwear. Many of the knit products sold by plaintiff are marketed under other trademarks: men's hosiery is sold under the "Mandate" mark, and women's body shirts under the "Magic Lady" mark.[13] Hence the likelihood of confusion is further diminished.

It should be noted here that the likelihood of plaintiff's expansion into defendant's product line, another variable in the *Polaroid* test, can often bridge the gap between dissimilar products. That is, if it is demonstrated that plaintiff has continuously expanded its product line in the past, and has further plans to expand into defendant's area, a court may be justified in finding a likelihood of confusion even between dissimilar products. See Pure Foods v. Minute Maid Corp., supra. But here there has been no showing that plaintiff has plans to sell bulk fabric to other garment manufacturers. Although plaintiff does manufacture its own fabric, it does so entirely for its own consumption. See fn. 3, supra.

With regard to another variable, it cannot be denied that there is a certain similarity in the marks. Nevertheless, it should be remembered where the products involved are dissimilar and non-competing, the degree of similarity necessary to support a finding of infringement is greater than with competing products. David Sherman Corporation v. Heublein, Inc., 340 F.2d 377 (8th Cir. 1965); A. Smith Bowman Distillery, Inc. v. Schenley Distillers, Inc., 198 F.Supp. 822 (D.Del.1961). The case for the similarity of marks would have been more compelling, furthermore, had plaintiff been able to establish that the "Exquisite" mark had acquired a strong secondary meaning. For despite plaintiff's insistence on the widespread identification of its products with the name "Exquisite", most of the labels and packages submitted in evidence[14] bore the mark "Exquisite Form". Defendant's pack-

---

13. It is true that the name Exquisite Form appears on both "Mandate" and "Magic Lady" packaging. But it is not given sufficient prominence to enable it to acquire a secondary meaning with reference to those products.

14. See plaintiff's exhibits 4, 5, 24, 25, 26, 27, 28, 30, 37. But see plaintiff's exhibit 3, a brassiere label with an "Exquisite" mark.

ages and labels, on the other hand, featured the word "Exquisite" most prominently. That word customarily appeared in bold face script, sometimes alone, and sometimes followed by the words "Knitwear Limited" or "Fabrics of London" in smaller Roman type.[15] I find little visual similarity between the marks, save that the "E" in both words is unusually prominent. The style of lettering differs noticeably; plaintiff's letters are slim, uniform, and rather graceful. Defendant's letters are thicker and not of uniform size: the "s" and the "q" appear larger than the other letters. I do not think it possible for anyone to conclude, on the basis of a mere comparison of the marks, that defendant was attempting to imitate plaintiff's logo.

Two other elements of the *Polaroid* test are the good faith of the accused infringer in adopting his mark and the degree of actual confusion among customers. Plaintiff has submitted no evidence on either point. There is nothing in the record before me suggestive of defendant's bad faith, nothing which raises an inference that the name "Exquisite" was adopted in order to trade on plaintiff's name and reputation. Cf. A. T. Cross Company v. Jonathan Bradley Pens, Inc., 355 F.Supp. 365 (S.D.N.Y.) affd., 470 F.2d 689 (2nd Cir. 1972). Nor has plaintiff cited even a single instance of customer confusion between its products and those of the defendant. It is true that actual confusion need not be demonstrated in order for plaintiff to obtain relief; all that need be shown is a likelihood of confusion. Nevertheless, courts have frequently recognized that a demonstration of actual confusion is highly persuasive proof of such likelihood. David Sherman Corporation v. Heublein, Inc., supra; Plough, Inc. v. Kreis Laboratories, 314 F.2d 635 (9th Cir. 1963); Societe Anonyme v. Julius Wile Sons & Co., 161 F.Supp. 545 (S.D.N.Y.1958). Plaintiff's failure to make any such showing further weakens its argument.

In sum, I am compelled to conclude that plaintiff has failed to demonstrate a "likelihood of confusion" between its mark and defendant's within the meaning of 15 U.S.C. § 1114(1). Few, if any, of the variables previously recounted weigh in its favor, and several weigh decisively against it. Chief among the latter is the inherent weakness of the mark, and plaintiff's failure to demonstrate secondary meaning. The weakness of the mark, coupled with the distance between plaintiff's and defendant's products, make the possibility of customer confusion remote, in my estimation. Plaintiff's first cause of action is accordingly dismissed.

## II.

Having found that no likelihood of confusion exists, I can deal with plaintiff's remaining claims in more summary fashion. I shall first consider plaintiff's other Lanham Act claim, in which he alleges a violation of 15 U.S.C. § 1125(a), § 43(a) of the Act. That statute makes actionable the use of a false designation of origin or any false description on one's products. It is far broader than § 1114(1), for any false advertising comes within its purview, whether or not it involves trademark infringement. As was noted in Geisel v. Poynter Products, Inc., 283 F.Supp. 261 (S.D.N.Y.1968), "[s]ection 43(a) provides relief against that kind of unfair competition which is analogous to the misappropriation or misuse of trade names or trademarks. The unfair competition must involve a misuse of a 'distinguishing characteristic' of the manufacturer's product or of the manufacturer himself." See also, Federal-Mogul-Bower Bearings Inc. v. Azoff, 313 F.2d 405 (6th Cir. 1963). It is now well settled that the origin that is falsely described need not be geographic only; any misrepresentation regarding the source, genesis or manufacture of the product comes within the section. PIC

15. See plaintiff's exhibits 8, 9, 10, 11, 13, 14, 38, 39.

Design Corp. v. Sterling Precision Corp., 231 F.Supp. 106 (S.D.N.Y.1964); N. S. Meyer, Inc. v. Ira Green, Inc., 326 F. Supp. 338 (S.D.N.Y.1971). The classic application of the statute is to the use by a defendant of a photograph of plaintiff's product to advertise its own (usually inferior) product. E. g., Zandelin v. Maxwell Bentley Mfg. Co., 197 F.Supp. 608 (S.D.N.Y.1961); General Pool Corp. v. Hallmark Pool Corp., 259 F.Supp. 383 (N.D.Ill.1966).

Where, as here, the § 43(a) claim is coupled with a claim of trademark infringement, the nature of the proof required under this statute may be simply stated. The plaintiff must establish that "the defendant's goods are likely to be thought to have originated with, or to have been sponsored by, the true owner of the mark." Societe Comptoir De L'Industrie v. Alexander's Department Stores, Inc., 299 F.2d 33 (2nd Cir. 1962). Therefore, as Judge Mansfield has noted, plaintiff has no easier a burden under § 43(a) than under § 32(1); he must still demonstrate a likelihood of consumer confusion. Ringling Bros., etc. v. Chandris America Lines, Inc., 321 F.Supp. 707 (S.D.N.Y.1971). See also, Callman, supra, § 18.2(b); Parkway Baking Co. v. Freihofer Baking Co., 255 F.2d 641 (3rd Cir. 1958).

The analysis of plaintiff's likelihood of confusion argument that appears in Part I of this opinion suffices to dispose of his claims under § 43(a) as well. I should note, however, that his argument is, if anything, weaker under this statute than that made under § 32(1). For the allegedly deceptive advertisements, one of which is set out at footnote 5, supra, emphasize the novelty and distinctiveness of defendant's product. There is repeated stress not merely on the European origin of the fabric, but on its recent arrival in the United States. Thus the headline of the advertisement which appeared in the June 7, 1972 issue of Women's Wear Daily reads: "The top name in European

Acrylic Double Knits is now in America. Exquisite." If, as plaintiff charges, defendant is attempting to capitalize on the good will plaintiff has accumulated over twenty-five years, one is forced to ask why defendant portrayed its product as a new arrival from Europe? Defendant's advertising, on balance, serves to distinguish its products from plaintiff's; it scarcely promotes confusion between the two. Plaintiff's claim under § 43(a) of the Lanham Act is accordingly dismissed.

### III.

Plaintiff's claim under § 368–d of the General Business Law of New York raises some difficult questions which plaintiff has not seen fit to address. The statute has never received a definitive construction from the highest court of New York and thus some confusion still exists regarding the extent to which it relaxes the standards of the Lanham Act. As Judge Gurfein has noted, this is an "anti-dilution" statute, and "dilution is an injury that differs materially from that arising out of the orthodox confusion." Mortellito v. Nina of California, Inc., 335 F.Supp. 1288 (S.D.N.Y.1972). Callman[16] has stated that "[t]he test for dilution should not be related to or even limited by the test for confusion. Even though there may be *no* confusion, the distinctiveness of a famous trademark may be debilitated by another's use and this is the essence of the wrong."

Although our Court of Appeals has left the question open,[17] most of the lower federal courts have rejected the Callman interpretation and required a showing of some likelihood of confusion. Girl Scouts of the United States of America v. Personality Posters Mfg. Co., 304 F.Supp. 1228 (S.D.N.Y.1969); Haviland & Co. v. Johann Haviland China Corporation, 269 F.Supp. 928 (S.D.N.Y. 1967); Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., 256 F. Supp. 382 (S.D.N.Y.1966). Some courts

---

16. 3 Callman, supra, § 84.2.

17. Gold Master Corp. v. Miller, 380 F.2d 128 (2nd Cir. 1967), at fn. 1.

have permitted, as an alternative to a demonstration of confusion, a showing that the defendant selected its mark with the express intent of trading on plaintiff's reputation. Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F.Supp. 4 (E.D.N.Y.1969); King Research, Inc. v. Shulton, Inc., 324 F.Supp. 631 (S.D.N.Y.1971). In the New York state courts, one of the leading cases on § 368–d has held that "to give effect to the dilution doctrine some measure of confusion must be present." Cue Publishing Co., Inc. v. Colgate-Palmolive Co., 45 Misc.2d 161, 256 N.Y.S.2d 239 (Sup.Ct., New York County), aff'd., 23 A.D.2d 829, 259 N.Y.S.2d 377 (1st Dept. 1965). See also, Anti-Defamation League v. Arab Anti-Defamation League, 72 Misc.2d 847, 340 N.Y.S.2d 532 (Sup.Ct., New York County, 1972).

Regardless of the applicable standard, plaintiff's showing has been inadequate. As I have already noted, it has demonstrated no likelihood of confusion between its products and defendant's. Nor, if "dilution" is the test, has plaintiff demonstrated that its mark is strong enough, or possessed of sufficient recognition or secondary meaning, to be in danger of dilution. A weak mark is by definition already diluted, and its possessor is thus in a poor position to invoke applicable antidilution statutes. See Esquire, Inc. v. Esquire Slipper Manufacturing Co., 243 F.2d 540 (1st Cir. 1957).

### IV.

Plaintiff devotes equally little attention to his claim under the common law of unfair competition. The distinction between a trademark infringement claim and that of unfair competition has been succinctly stated: "Trademark infringement rests on a relatively narrow principle compared to unfair competition. The essential element of a trademark is the exclusive right of its owner to use a word or device to distinguish his product. On the other hand, a claim of unfair competition considers the total physical image given by the product and its name together. Thus unfair competition exists if the total impression of package, size, shape, color, design and name upon the consumer will lead him to confuse the origin of the product." Jean Patou, Inc. v. Jacqueline Cochran, Inc., 201 F.Supp. 861 (S.D.N.Y.1962), aff'd. 312 F.2d 125 (2nd Cir. 1963). While New York law governs this claim,[18] plaintiff must still meet the familiar burden of demonstrating likelihood of confusion. Sears, Roebuck & Co. v. Allstate Driving School, Inc., supra; Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc., supra; Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607 (2nd Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Dell Publishing Co. v. Stanley Publications Inc., 9 N.Y.2d 126, 211 N.Y.S.2d 393, 172 N.E.2d 656 (1961). As I have noted several times earlier, this he has failed to do.

### V.

The only remaining question concerns plaintiff's motion for a default judgment against Exquisite Fabrics of London. The record reveals that the marshal served both copies of the summons and complaint on one Henry Banks, who is president of HAIL. HAIL answered, and Exquisite Fabrics did not. It is plaintiff's contention that Exquisite Fabrics is in some sense a division or subsidiary of HAIL, and that valid service was effected on the former through service on Banks. The facts developed at the trial do not support this theory. It is undisputed that HAIL and Exquisite Fabrics share the same address and the same telephone number. Banks, however, testified that Exquisite Fabrics of London is simply the American sales agent for Exquisite Knitwear, Ltd. He testified further that HAIL and Exquisite Fabrics, although they occupy the same floor, have different offices and different personnel. He disclaimed any participation in Exquisite

---

18. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774 (2nd Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed. 2d 799 (1965).

Fabrics' operations and identified one Piers Lishman as a principal member of the concern. Lishman, of course, was not served. Plaintiff made no attempt to develop a factual record in contravention of these statements, and I am thus constrained to find the service on Banks insufficient to constitute service on Exquisite Fabrics. It is settled that the plaintiff has the burden of proving that the person served was "an officer, a managing or general agent, or . . . [an] agent authorized by appointment or by law to receive service of process" within the meaning of Rule 4(d)(3) of the Federal Rules. Gottlieb v. Sandia American Corporation, 452 F.2d 510 (3rd Cir. 1971); Dominguez v. National Airlines, Inc., 42 F.R.D. 35 (S.D.N.Y. 1966). Since I am presented only with Banks' uncontradicted testimony, I cannot conclude that plaintiff has met that burden.

■ Even if I were to find service of process on Exquisite Fabrics to have been valid, plaintiff would not be entitled to a default judgment. When a default is entered against one defendant in a multi-defendant case, the preferred practice is for the court to withhold granting a default judgment until the trial of the action on the merits against the remaining defendants. If plaintiff loses on the merits, the complaint should then be dismissed against both defaulting and non-defaulting defendants.[19] Frow v. DeLaVega, 15 Wall. 552, 82 U.S. 552, 21 L.Ed. 60 (1873); Roach v. Churchman, 431 F.2d 849 (8th Cir. 1970); 6 Moore's Federal Practice ¶ 55.06. The entry of default against Exquisite Fabrics is accordingly vacated and the action dismissed against it as well.

In sum, plaintiff has failed to sustain his burden of proof on any of the four causes of action.[20] The clerk is therefore directed to enter judgment for the defendants dismissing the complaint.

It is so ordered.

---

19. This rule obtains only where, as here, the liability of the defendants is joint.

---

20. I therefore need not consider the defense of laches interposed by HAIL.