HABITAT DESIGN HOLDINGS
LIMITED and Habitat America
Holdings, Inc., Plaintiffs,

v.

HABITAT, INC., Defendant.

No. 77 Civ. 2474 (JMC).

United States District Court,
S. D. New York.

Aug. 22, 1977.

Smith, Steibel, Alexander & Saskor, P.C., New York City (Michael Alexander, New York City, of counsel), and Sughrue, Rothwell, Mion, Zinn & MacPeak, Washington, D.C. (G. Franklin Rothwell and Robert G. McMorrow, Washington D.C., of counsel), for plaintiffs.

Jacobs & Jacobs, P.C., New York City (Mark H. Sparrow and Jesse D. Reingold

New York City, of counsel), and Gleason, Laitman, Mathews, Magidson & Rosen, New York City (Daniel E. Laitman, New York City, of counsel), for defendant.

CANNELLA, District Judge.

Plaintiffs, after a bench trial are permanently enjoined from infringing defendant's trademark or trade name, "Habitat," or unfairly competing with defendant. The complaint is dismissed.

Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1338 and 15 U.S.C. § 1121.

## THE FACTS

The facts of this case differ from those normally encountered in infringement actions for here, although plaintiffs are second comers, they are not newcomers. Plaintiff Habitat Design Holdings Limited ["Habitat England"] is a British corporation that operates a chain of retail stores principally in England. It was begun in 1964 by Terence Conran, a well-known designer and author, and has expanded over the years to thirty-one stores in three countries. Since 1968, the company also has engaged in mail order sales to customers throughout the world, including the United States. Because the stores sell a complete line of items for the home, Conran looked for a name that would connote "home" and chose "Habitat." It is not contended that Conran knew of defendant's existence at the time.

Conran's concept for Habitat England was to provide quality contemporary design at affordable prices. This concept apparently has been so successful abroad that the company decided to expand its marketing operation across the ocean and into the United States.

To effectuate this purpose, Habitat England created Habitat American Holdings, Inc., a Delaware corporation and the other plaintiff in this action.[1] In March of this year a twenty-five year lease was signed between Habitat England and Citicorp for approximately 40,000 square feet of retail space at The Market at Citicorp Center, 54th Street and Third Avenue in New York City. This was to be the beginning of a chain of Habitat England stores throughout the United States.

Defendant Habitat, Inc. ["Habitat New York"] is a New York corporation engaged in the design, manufacture and sale of furniture, lighting and some accessories. Although defendant was incorporated in 1957, its predecessor Habitat Associates traded under the name "Habitat" at least since 1952. Throughout its twenty-five year history, Habitat New York has held a reputation for outstanding design of high quality contemporary home furnishings. In fact, several of defendant's products were selected by the Museum of Modern Art for its permanent design collection and are included in a book on American design published by the National Museum of Modern Art in Kyoto, Japan. Needless to say, the defendant's merchandise, is, for the most part, very expensive.

Habitat New York is not a retail operation and engages in little, if any, advertising directly to the consumer. Instead, it sells through designers, decorators, architects and retail department stores, maintaining a showroom at 150 East 58th Street in New York City for display of its goods. Additionally, sales representatives publicize Habitat New York's products in their showrooms throughout the country. Frequently updated catalogues are distributed to designers, decorators and architects for display to their clients. Generally, however, the purchase is not consummated until the customer visits the showroom to inspect the goods. In the New York showroom the customer sees the "Habitat" tag, label or imprint on every item. The designer may also describe the high quality and exclusivity of the product in an effort to explain its costliness. Finally, after purchase, the customer receives the item in a "Habitat" carton.

---

1. For the remainder of this Opinion, both plaintiffs will be referred to as Habitat England and the defendant as Habitat New York.

Consequently, although Habitat New York does not engage in the same kind of consumer advertising as does the ordinary retail operation, its name is known, especially among persons who use the services of a designer, decorator or architect. Additionally, defendant has secured both federal and state registrations of its trademark. Except for two federal registrations that lapsed through oversight, these registrations are all in full force and effect.

Habitat New York did not learn of Habitat England's existence until 1971, at which time it advised the company not to enter the United States under the name "Habitat." More recently, when Habitat New York learned of Habitat England's plan to open a retail store in New York City, the former asserted its rights to the plaintiffs through a letter of counsel dated February 14, 1977 and subsequent oral communications. Despite this, Habitat England signed the lease with Citicorp to open its establishment just a few blocks from Habitat New York's showroom.

Threatened with an infringement suit, plaintiffs brought this action for a declaration that the opening of their "Habitat" store in New York City would not violate defendant's rights. 28 U.S.C. §§ 2201, 2202. Defendant, seeking to enjoin plaintiffs' activities in this regard, counterclaimed for trademark infringement, unfair competition, deceptive use of a trade name and false designation of origin, and moved for a preliminary injunction. At the hearing the parties agreed to proceed immediately to trial under Fed.R.Civ.P. 65(a)(2). Pending a determination on the merits of the case, the Court issued a temporary restraining order enjoining plaintiffs, *inter alia*, from opening, advertising or initiating any new construction on the retail store scheduled to open in New York in October 1977 under the name "Habitat."

2. The issues raised in the complaint and counterclaims are basically identical.

3. Defendant presently holds federal registration numbers 672,232 (lighting fixtures); 875,051

## DISCUSSION

At trial the Court recognized and the parties agreed that their respective legal rights rested on whether a likelihood of confusion would exist between Habitat England and Habitat New York. Accordingly, the discussion of the various claims pressed in this matter will focus on this question.[2]

## TRADEMARK INFRINGEMENT

Defendant, having federally registered its trademark "Habitat" for use in conjunction with furniture, lighting and divers accessories,[3] claims infringement under 15 U.S.C. § 1114. This section provides relief against a junior user, *i.e.*, one whose use is subsequent to that of the registrant, only when "such use is likely to cause confusion, or to cause mistake, or to deceive".[4] Defendant, of course, argues that confusion is not only likely but inevitable; plaintiffs counter that the public will suffer no confusion between the two companies because; (1) their products are readily distinguishable from one another; (2) the buyers are sufficiently sophisticated to distinguish the companies' products; and (3) the marketing characteristics of the two companies are distinct. Additionally, plaintiffs contend that defendant's "Habitat" mark deserves no protection because of abandonment and wide third-party usage. These claims will be discussed individually.

### Similarity of Product

The Second Circuit has noted that identity of product is not necessary in an infringement case if the items "are sufficiently similar to make confusion likely," *Admiral Corp. v. Penco, Inc.*, 203 F.2d 517, 520 (2d Cir. 1953), *i. e.*, "if they fall within the same general market, or appeal to essentially the same class of consumers," *Exquisite Form Indus., Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 411–12 (S.D.N.Y. 1974) (Bauman, J.).

(electrical lights); and 907,364 (planters, waste receptacles, furniture and lighting).

4. The requirement that the infringing use be "in commerce" has been satisfied.

Plaintiffs herein, however, claim that the Habitat England products are so dissimilar from the items manufactured by Habitat New York that confusion is unlikely. Although witnesses on both sides testified as to their opinions in this regard, the Court is itself capable of comparing the various products and concludes that the items are indeed similar both in function and style. While Habitat England retails a far wider variety of items than does Habitat New York, the particular pieces the New York company does sell find their less expensive counterparts in the English inventory. Thus, both companies sell such items as tables, desks, chairs, planters, lamps and lighting fixtures. Moreover, both companies promote the contemporary "uncluttered look," which features metal and glass objects in geometric shapes.

Plaintiffs also claim that the products sold by Habitat England and Habitat New York appeal to different markets because of their disparity in price. This argument fails for two reasons. Firstly, it is unrealistic to assume that, merely because an individual can afford to purchase an expensive lamp or piece of furniture, he will not be tempted to buy a similarly looking piece at a greatly reduced price. Secondly, it is not true that *all* of Habitat England's products are modestly priced and *all* of Habitat New York's products are quite costly. For example, a Habitat New York advertisement, which appears in the June 1977 issue of *House and Garden* magazine, features two light fixtures priced at $35.00 each.

In sum, the Court finds the products of the respective parties so similar as to make confusion likely.[5]

---

5. Even with regard to Habitat England's sale of the various kinds of goods not manufactured by Habitat New York, such as kitchenware, linens, wall and floor coverings and children's toys, likelihood of confusion is indeed a possibility and an infringement action may lie.

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers. Even this extensive catalogue does not exhaust the possibilities—the court may have to take still other variables into account.

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) (Friendly, J., writing for the panel). The various criteria listed by Judge Friendly, as they pertain to the facts of this case, will be discussed one at a time.

1. *Strength of the Mark*

Defendant's "Habitat" mark is strong both because it is "suggestive," rather than "descriptive," and also because it has acquired a "secondary meaning." According to Judge Weinfeld,

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968), *quot-ed in West & Co., Inc. v. Arica Inst., Inc.*, 557 F.2d 338, 342 (2d Cir. 1977). The term "Habitat" connotes "home" or "environment" and suggests a variety of goods and services. One could just as easily use the term for a real estate agency as for a manufacturer or retailer of home furnishings. The mark therefore deserves some protection as being non-descriptive.

Defendant's "Habitat" mark, however, also has what is known as a "secondary meaning" and is thereby strengthened. "A secondary meaning exists when a party through advertising, massive exposure, or the distinctive quality of its product has established its mark in the minds of consumers as an indication of origin from one particular source." *Exquisite Form, supra*, 378 F.Supp. at 410. Again, although defendant has not engaged in massive advertising, its name is known in connection with the upper echelon of contemporary home furnishings.

2. *Similarity of the Marks*

Plaintiffs' mark is identical to that of the defendant, except for typeface: defendant generally prints its mark in all upper case letters, whereas plaintiffs' mark is written with only the "H" capitalized. However, plaintiffs' mark very much resembles regular manuscript print and therefore appears almost identical to defendant's mark printed in a magazine or typed on a purchase order.

3. *Proximity of the Products*

Plaintiffs' products that defendant does not manufacture still share the similarity of use in the home. Defendant may not sell china and glassware, but it does manufacture the dining table upon which such items are placed as well as the lighting to eat by. Thus, a degree of

## Buyer Sophistication

■ Plaintiffs claim that the extreme sophistication of the architects, contractors, designers and retail store buyers that purchase defendant's goods eliminates the possibility of confusion. The Court disagrees. Whether or not these *professionals* might be confused between the two companies, plaintiffs' argument ignores the less sophisticated status of the ultimate purchaser of defendant's products: *the consumer.* Even in New York City, the relative sophistication of purchasers of expensive furniture spans a broad spectrum. An observation by then Chief Judge Friendly in an infringement case involving expensive cameras applies here as well:

> Indeed, the most accurate characterization of the buyer market for these cameras would very likely be that of one composed of both discriminating and casual, relatively unknowledgeable buyers. In such a case, a court must give consideration to the probability of confusion on the part of the latter as well as of the former.

*Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971). *See also Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1339–42 (2d Cir. 1975).

## Channels of Trade

■ It is plaintiffs' position that no likelihood of confusion exists between Habitat New York and Habitat England because the former sells to the trade and the latter sells directly to the consumer. In this regard, plaintiffs stress that defendant's New York showroom is not open to the public and that consumers buying defendant's products from retail department stores are, for the most part, ignorant of their origin at the time of purchase. Assuming the truth of these assertions, the different

proximity exists between the parties' respective products.

4. *Prior Owner Bridging the Gap*

There is little likelihood and no evidence to indicate that defendant will "bridge the gap" and enter plaintiffs' extensive product line.

5. *Actual Confusion*

In that Habitat England's store had not yet opened at the time of trial, it would be unreasonable to expect defendant to have produced substantial evidence of actual confusion. However, this factor has been established to some extent. Admitted into evidence at trial was a letter addressed to Habitat New York from a woman who had lived in England for several years and had often shopped at Habitat England. The woman saw a Habitat New York advertisement for lamps in a magazine and wished to find out whether this company was a branch of the store she had frequented in England.

6. *Good Faith*

There is no dispute that Mr. Conran acted in good faith when he chose the "Habitat" mark for the English company. Defendant also concedes that Habitat England is an "innocent" user: one "whose use is not attributable to intent to obtain a free ride on the reputation of the owner of the trade-mark." *Triumph Hosiery Mills, Inc. v. Triumph Int'l Corp.,* 308 F.2d 196, 199 (2d Cir. 1962). However, after being contacted by defendant in 1971 and in February of this year, and after meetings between counsel and principals of the respective parties, plaintiffs nonetheless signed the Citicorp lease. This decision might very well have been on the advice of counsel, but erroneous legal advice does not operate to deprive the defendant of its rights. The Court thus finds that plaintiffs acted in less than good faith when they arranged their expansion into the United States under the name "Habitat."

7. *Quality of Junior User's Product*

A consideration of this factor cannot be had in a vacuum but instead must be viewed in terms of a comparison between the items sold by the respective parties. Although Habitat England's products may represent excellent value for the price paid, they simply are not in the same category as those manufactured by Habitat New York. The reputation of Habitat New York is for being "the best"; the association of any lesser product, no matter how good, with the defendant cannot help but tarnish this reputation.

8. *Sophistication of the Buyers*

The Second Circuit has noted that the importance of this criterion is minimal where the marks in question are identical. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.,* 411 F.2d 1097, 1101 (2d Cir. 1969), *cert. dismissed,* 396 U.S. 1054, 90 S.Ct. 707, 24 L.Ed.2d 698 (1970). See, additionally, text *infra* (*Buyer Sophistication* ).

Accordingly, although the finding that the parties' product lines are indeed "sufficiently similar" obviates the above analysis, the Court concludes that plaintiffs' use of "Habitat" on even its non-competing products is likely to cause confusion and, hence, infringes defendant's trademark.

routes by which the two companies' products reach the consumer do not necessarily preclude "likelihood of confusion."

The seminal case in this area is *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir. 1959), wherein a wholesale distributor of donut mix sought to enjoin a donut retailer from using its name. The court found no likelihood of confusion because the retailers in defendant's trading area to whom plaintiff distributed its mix sold the donuts under different names. The ultimate consumer, therefore, had no way of knowing that the donuts purchased from these retailers were made from mix supplied by plaintiff. *See David Crystal, Inc. v. Soo Valley Co.*, 471 F.2d 1245, 1246 (Cust. & Pat.App.1973).

By contrast, an injunction was granted in *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482 (5th Cir. 1971), even though the parties utilized different marketing channels. Unlike the plaintiff in the *Dawn Donut* case, the plaintiff manufacturer and wholesale distributor of carpets in *World Carpets* promoted its trademark to both the wholesale and retail trade. The trademark was used on tags attached to the carpeting as well as on various business forms. The court found plaintiff had proven "likelihood of confusion" and enjoined defendant's use of a similar mark as its trade name.

Rejecting defendant's argument that direct competition between the parties is an essential element of an infringement action, the Fifth Circuit observed:

> Since the likelihood of a second user's practices adversely affecting the first user's reputation has been recognized as the basis for an actionable wrong, *a fortiori* an action will lie if the mere fact [of] a second user's presence as a retailer adversely affects the first user's competitive ability as a wholesaler.

*Id.* at 488. This last point is especially pertinent to the matter before the Court. Several interior designers testified in court, and others swore to affidavits, that they would cease recommending defendant's products to their clients were plaintiffs to open the proposed retail store under the name "Habitat."

*Dawn Donut* and *World Carpets* taken together illustrate the role of marketing channels in an infringement action. The fact that the junior user markets its products in a manner different from that used by the registrant does not, without more, raise the inference that the public is not likely to be confused. *Compare Field Enterprises Educational Corp. v. Cove Indus., Inc.*, 297 F.Supp. 989 (E.D.N.Y.1969). Plaintiff's wholesaler status in *World Carpets* did not prevent the court from enjoining a retailer's use of a confusingly similar mark because plaintiff's carpeting reached the consumer identified as a product originating with the plaintiff.

Defendant Habitat New York has an even stronger case than that of the *World Carpets* plaintiff. Like the carpeting sold by World Carpets, Inc., Habitat New York's products reach the consumer identified as "Habitat" products and packaged in "Habitat" cartons. Unlike the consumers purchasing World Carpets, however, Habitat New York's customers may, when dealing with a member of the trade, visit the New York showroom and purchase directly from the defendant. Indeed, interior designers encourage their clients to visit the showroom before making a purchase. Additionally, prospective customers are free to enter showrooms maintained by defendant's sales representatives in various parts of the United States, whether or not such visits are arranged by a decorator, designer or architect.

Consequently, the different marketing characteristics exhibited by Habitat New York and Habitat England in no way preclude a finding of likely confusion, for defendant's product still reaches the consumer identified with the "Habitat" name.

*Abesandonment*

Plaintiffs claim that, because defendant no longer uses the "Habitat" mark except to promote its lighting products and plaintiffs will not use the term "Habitat" in conjunction with the lighting products it

will retail in the United States, the opening of Habitat England in New York and other American cities will not constitute an infringement. The premise of plaintiffs' argument, however—that Habitat New York has abandoned the "Habitat" mark with respect to the other items it markets—is not supported by the evidence.

Defendant's most current catalogue, which is distributed to the trade, identifies defendant's tables as "Habitat" tables. Although the binder cover reads "Architectural Supplements, Inc.," this corporation operates merely as a sales agency for items manufactured by "Habitat." Nor does the title of the binder seem to have any influence on the people who receive it; the interior decorators who testified at trial and submitted affidavits all look upon and promote defendant's products as "Habitat" products.

At trial, defendant produced tags, labels, instruction sheets and cartons containing the "Habitat" mark, which are currently in use for the gamut of defendant's goods. Habitat New York's labeling in this manner of items such as tables, umbrella stands and urns, in addition to lighting products, belies plaintiffs' assertion that defendant has partially abandoned the "Habitat" mark.

*Third-Party Usage*

■ That widespread third-party usage of defendant's mark exists and that defendant has knowingly allowed it to continue, was not proved by plaintiffs. Max Greenstreet, a private investigator employed by the plaintiffs, testified that he visited several establishments called "Habitat," but there was no proof that these stores sell furniture. In fact, Mr. Greenstreet admitted that none of the stores he visited had any merchandise similar to that sold by the defendant. Other evidence submitted by plaintiffs also indicates third-party usage

associated with dissimilar products and services. Ordinarily, such evidence tends to weaken the particular mark. *See Exquisite Form, supra*, 378 F.Supp. at 410. Here, however, the distinctiveness of defendant's "Habitat" mark was established abundantly. See note 5 *supra (Strength of the Mark )*.

Nor was Habitat England able to substantiate its claim that defendant has knowingly permitted its mark to be used by others. Indeed, defendant's president testified that, in cases where there has been a conflict with his product line, Habitat New York has undertaken efforts to stop the third-party usage of its mark and will continue to do so in the future.

■ Accordingly, the Court finds that the registrant, Habitat New York, has proven its federal infringement claim under 15 U.S.C. § 1114 by showing that Habitat England's use of the "Habitat" mark in defendant's trading area would likely cause confusion. In that the defendant also has registered its trademark with New York State,[6] it has established a state infringement claim as well. See N.Y.G.B.L. § 368–b (McKinney 1968).[7]

### UNFAIR COMPETITION

■ Defendant's claim that plaintiffs' conduct constitutes unfair competition must succeed, for here, too, "[t]he critical question is whether customers are, or may be, misled." *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 863 (S.D.N.Y.1962) (Bonsal, J.), *aff'd*, 312 F.2d 125 (2d Cir. 1963). Additionally, the law of unfair competition subsumes the infringement of a trademark; therefore, proof sufficient to support the latter claim logically and legally establishes the former.[8]

### CONCLUSION

■ Accordingly, plaintiffs are hereby enjoined from opening a retail establish-

---

6. Defendant presently holds New York State registration numbers 14603 (planters and waste receptacles); 14604 (lighting fixtures); 14605 (furniture and various accessories); and 14606 (electrical lamps and lights).

7. This section is almost identical to the federal statute.

8. Under these circumstances the Court finds it unnecessary to decide defendant's remaining counterclaims.

ment in New York City under the name "Habitat," or in other locations in the United States where such action would constitute unfair competition with defendant and an infringement of defendant's trademark.[9] Plaintiffs' complaint is dismissed; defendant's counterclaims for damages are dismissed for lack of proof.[10]

The foregoing constitute the findings of fact and conclusions of law of the Court pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

The defendant is hereby directed to submit a Judgment on notice within ten days.

The Court hereby denies a stay of this Order pending appeal, should the plaintiffs file an appeal in this matter.

SO ORDERED.

---

9. Defendant's request that Habitat England be enjoined from continuing its mail order business in the United States, is denied. Firstly, the marketing characteristics of plaintiffs' mail order business are so distinct from defendant's methods of sale as to avoid confusion. The American receiver of a Habitat England catalogue is clearly apprised of the fact that he is dealing with an English company, for the catalogue is mailed from England, the order must be forwarded to England and the merchandise ordered is shipped from England. Secondly, in that defendant has been aware of plaintiffs' existence since at least 1971, the request that this aspect of the English operation cease comes too late.

10. At trial the Court reserved decision on the admissibility of Exhibit H of plaintiffs' Exhibit 6. The Court admits the exhibit into evidence, but finds it of little probative value.